IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN THE MATTER OF DETENTION OF: | ) ) | No. 78222-3-I |
| T.C. | ) ) ) ) ) ) ) ) | DIVISION ONE<br><br>PUBLISHED OPINION<br><br>FILED: October 28, 2019 |

HAZELRIGG-HERNANDEZ, J. — T.C. appeals his 14-day involuntary commitment by challenging the sufficiency of the evidence, arguing that his constitutional right to a jury was violated, that the court relied on improper evidence, and that the court failed to comply with RCW 71.05.240. We find no error as to the first two claims and that the error as to improper evidence was harmless. Because the court failed to comply with its obligations under RCW 71.05.240 regarding notice as to the loss of T.C.'s constitutionally protected firearms rights, we reverse and remand.

## FACTS

T.C. served in the Army for three years. On February 20, 2018, he went to the King County Veteran's Program (KCVP) office to receive services. While waiting in the lobby, T.C. noticed that there was discussion on the television of a recent school shooting in Florida where 17 people were killed. According to Brian Fry, a manager at the KCVP's office, T.C. became agitated in the lobby and

refused to fill out an application as requested by staff. When Fry confronted T.C., T.C. expressed further frustration and made the comments "[t]his is why people go postal" and "[t]his is why places get shot up." Fry told T.C. to leave, however he refused which eventually led to the arrival of police and T.C.'s arrest for misdemeanor harassment.

While in custody, T.C. was referred for civil commitment for involuntary mental health treatment. A petition for 14-day involuntary treatment was filed on February 28, 2018 which alleged that T.C. was gravely disabled as a result of a mental disorder and presented a likelihood of serious harm to others. The hearing occurred later that day.[1] The court did not inform T.C. orally or in writing that he would lose his firearm rights if he were involuntarily committed, or that this could be avoided if he made a good faith effort to voluntarily participate in treatment.

At the hearing, testimony was taken from T.C., Fry, and Hyemin Song, a licensed clinical social worker at Cascade Behavioral Hospital who had evaluated T.C. Song testified that T.C. had a mental disorder and the working diagnosis for him was psychosis. She further testified that this mental disorder caused T.C. to be both "gravely disabled" and a substantial danger to others. Fry testified as to the events at the KCVP office that he had been fearful of T.C. during the incident.

The findings on the hearing acknowledged that the court found both Fry and Song's testimony to be credible and that T.C. was not credible at all. The court stated that T.C. made inconsistent statements. The court also specifically stated

---

[1] The Report of Proceedings transmitted to this court appears to be dated incorrectly as January 28, 2018 on the first two pages. All other materials in the record make clear that T.C.'s involuntary treatment hearing occurred on February 28, 2018 and the misdated transcript appears to be otherwise consistent with the parties, facts and claims at issue in this case.

"[T.C.] says that there was a courthouse built on First Avenue in 1999, which is not accurate. I'm a judge and have been in practice here in Seattle for much longer than since 1999 and that courthouse doesn't exist." The court noted other inconsistent statements and an apology by T.C. for statements he attributed to the television.

The judge found T.C. suffered from a mental impairment that had a substantial adverse effect on his cognitive and volitional functions and that he posed a substantial risk of serious physical harm to others as a result of his mental impairment. The court made this finding based on testimony from Song and Fry. Additionally, the judge found that if T.C. was not detained, he posed a future danger to others. The court rejected the state's argument that T.C. was gravely disabled.

T.C. timely appealed arguing that the trial court lacked substantial evidence to have granted the 14-day petition and that the judge improperly relied on personal knowledge as evidence. T.C. also challenges the constitutionality of his 14-day commitment hearing as a violation of his right to have the matter heard by a jury. Finally, T.C. asserts that this court should reverse and vacate the order of commitment due to the court's failure to comply with RCW 71.05.240(2). This statute requires the court to advise a patient facing involuntary commitment, such as T.C., orally and in writing that a commitment finding results in the loss of his firearm rights and that this outcome could be avoided through voluntary participation in the recommended treatment.

## DISCUSSION

I. Evidentiary challenges to T.C.'s involuntary commitment proceedings

    A. Sufficiency of the evidence supporting the order for 14-day involuntary treatment

We first look to T.C.'s argument regarding the sufficiency of the evidence to commit him for 14 days based on the court's finding that he presented a likelihood of serious harm to others as a result of a mental disorder. Appellate review of the trial court's ruling on involuntary commitment is limited to determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusion of law and judgment. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998). "Substantial evidence is 'evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" Id. (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390, 583 p.2d 621 (1978)). The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact. Id.

A court may order a person held for 14 days of involuntary treatment when the state has demonstrated by a preponderance of the evidence that, as a result of a mental disorder, the person presents a likelihood of serious harm or is gravely disabled. RCW 71.05.240(3); In re Det. of W.C.C., 193 Wn. App. 783, 785-86, 372 P. 3d 179 (2016). A "mental disorder" is an organic, mental, or emotional impairment that "has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(37). A "likelihood of serious harm" means "a substantial risk" of physical harm to self, others, or property of others. RCW

71.05.020(35)(a). For a finding of substantial risk of harm to others, the State must demonstrate "behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining harm." RCW 71.05.020(35)(a)(ii).

The court here entered findings and identified the evidence upon which it relied in reaching those findings after the hearing. Based on Song's testimony, the court found that T.C. suffered from a mental disorder as defined in RCW 71.05.020(37). The court relied on the testimony of both Fry and Song to find that T.C. was likely to cause serious harm to others if not detained due to his conduct toward others at the KCVP. The court correctly stated that all that is required under the case law and RCW 71.05.020(27) is that another person be placed in reasonable fear of sustaining such harm. The Supreme Court has stated, "We thus interpret RCW 71.05.020 as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness." In re Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982).

The record is clear that Fry testified to being fearful due to the incident in the KCVP lobby and that he was concerned about T.C. returning to KCVP to act in the same way he had previously. Song's testimony also supports the court's findings as she was able to observe T.C. having an "agitated episode." Song provided her expert opinion as to T.C.'s impairment and that he presented a substantial risk of physical harm. The court had substantial evidence to support its findings and order of commitment.

B. The court's consideration of improper testimony by the judge

When acting as the trier of fact, judges weigh credibility, which may be based in part on some personal knowledge. Fernando v. Nieswandt, 87 Wn. App. 103, 109, 940 P.2d 1380 (1997). T.C. testified that he "was one of two building inspectors that was qualified for the Federal Emergency Management Administration to do work on the First Avenue courthouse when it was rebuilt in 1999."

When ruling at the conclusion of the hearing, the judge stated:

> I do not find the respondent's testimony credible in almost any way at all. Based on the mode, manner, and method of his testimony, the way he speaks, the things that he says that are clearly nonsensical. They are contradictory. He says that there was a courthouse built on First Avenue in 1999, which is not accurate. I'm a judge and have been in practice here in Seattle for much longer than since 1999 and that courthouse doesn't exist.

The record does not reflect an objection to this last statement by either party. T.C. now argues that this was improper testimony by the trial court in violation of ER 605, which states "[t]he judge presiding at the trial may not testify in that trial as a witness." He further asserts that the statement from the judge constituted prejudicial error. The issue is preserved under the express language of ER 605, even without an objection below; therefore it is properly raised for the first time on appeal.

The state asserts that this was merely the judge exercising his common sense and suggests that the statement here is more akin to an illustrative comment. The state denies the claim that the comment prejudiced T.C. We review the alleged testimony by the judge to determine whether it was harmless or

prejudicial. <u>Vandercook v. Reece</u>, 120 Wn. App. 647, 652, 86 P.3d 206 (2004). In <u>Vandercook</u>, the court determined that the judge's recitation of his recollection of earlier proceedings was testimony for purposes of ER 605 analysis. "Evidential error is harmless if, without it, the trial court would necessarily have arrived at the same conclusion." <u>Id.</u> Here the court identified numerous other factors that were considered in weighing the evidence, particularly regarding T.C.'s testimony.

Beyond the judge's comment about the nonexistence of a courthouse on First Avenue, the court also provided other bases for his determination as to T.C.'s credibility, such as the "mode, manner and method of [T.C.'s] testimony, the way he speaks" and T.C.'s claim that some statements were made by the television and not by him. There is no indication that the judge was advancing bias, prejudice, or impropriety in his comment about the courthouse. The judge went on to state, "That's not to say that I think [T.C.] has ill meaning or a bad guy. But I do want the record to reflect I don't give his testimony any credibility at all." Though the judge did improperly rely, in part, on his personal knowledge that a courthouse referenced by T.C. does not exist, the error was harmless because the court explicitly provided a multitude of other factors within the evidentiary record supporting the ultimate determination that T.C.'s testimony was not credible.

II.    Whether there is a right under the Washington Constitution to a jury trial in proceedings for 14-day involuntary commitment

T.C. avers that there is a guaranteed constitutional right to a jury trial for 14-day involuntary commitment proceedings. This argument has been rejected by the court numerous times and we find no reason to depart from well-established

precedent. This court engaged in a robust analysis of this issue in In the Matter of the Detention of S.E. 199 Wn. App. 609, 400 P.3d 1271 (2017). The published portion of S.E. directly examined the issue of whether a constitutional right to jury trial exists for 14-day civil commitment proceeding. Rooted in a thorough review of the history of the right to a jury trial in mental health proceedings in Washington State, this court rejected that such a right exists for 14-day commitment proceedings. The present case is not distinguishable from S.E. T.C. argues that S.E. was wrongly decided; however we are not persuaded.

Washington courts have held that there is no right under the state constitution in proceedings seeking longer periods of involuntary detention than T.C.'s. Recently, this court held that there was no right to a jury trial for 90-day involuntary commitment proceedings under the state constitution. In re Det. of C.B., 9 Wn. App. 2d 179, 183, 443 P.3d 881 (2019). Further, the Supreme Court held that no constitutional right to a jury exists in a 180-day recommitment hearing after dismissal of serious felony charges based on a finding that the defendant was not competent to stand trial. In re Det. of M.W., 185 Wn.2d. 633, 663, 374 P.3d 1123 (2016).

T.C. cites to In the Matter of: William C. Ellern; William C. Ellern v. The Superior Court for Spokane County as support for his assertion that this right existed at the time of the adoption of the state constitution. 23 Wn.2d 219, 160 P.2d 639 (1945). Ellern differs significantly in that it involved an individual who was detained for nearly five months and facing indefinite involuntary commitment. Id. at 221. Ellern is not analogous to the current case and in S.E. the court properly

analyzed the identical argument. We are bound by prior precedent and "[o]verruling a prior decision . . . is not a step that should be taken lightly." Keene v. Edie, 131 Wn.2d 822, 831, 935 P.2d 588 (1997). We find no reason to depart from the court's clear rejection of the assertion that a right to a jury trial exists for 14-day involuntary commitment proceedings.

III. The court's obligation to advise the patient in a commitment hearing as to the impact of firearm rights

A. Manifest error affecting a constitutional right may be raised for the first time on appeal.

Though not raised in the proceedings below, T.C. argues on appeal that reversal and vacation of the order of commitment is required due to the court's failure to comply with the statutory notice requirements for commitment proceedings as to the risk of loss of firearms rights. The state initially argued in their briefing that notice was properly given to T.C., but abandoned that position at oral argument and conceded that the proceedings below did not comply with the requirements of RCW 71.05.240(2).

At oral argument, T.C. urged this court to review this error under RAP 2.5 as noncompliance with the statute directly impacts T.C.'s constitutional right. Under RAP 2.5(a)(3), a party may raise "manifest error affecting a constitutional right" for the first time on appeal. In State of Washington v. A.M., the Supreme Court addressed the threshold determination of whether RAP 2.5(a)(3) allows for review of an error affecting a constitutional right not preserved by objection in the court below. No. 96354-1, (Wash. Sep. 12, 2019),

- 9 -

http://www.courts.wa.gov/opinions/pdf/963541.pdf. In A.M., the Court held that such review requires a plausible showing by the appellant that the error has practical and identifiable consequences in the trial of the case. Id. at 5. This is a distinct standard from the review of the alleged constitutional violation itself, as RAP 2.5 "serves a 'gatekeeping function.'" Id. (citing State v. Lamar, 180 Wn.2d 576, 583, 327 P.3d 46 (2014)).

Here T.C. has made a plausible showing that the trial court's failure to comply with RCW 71.05.240(2) at the hearing resulted in a loss of his right to bear arms under both the Washington State Constitution and the Federal Constitution. This satisfies the threshold question of whether the error implicates a constitutional right. T.C. demonstrates that the error had practical and identifiable consequences at the hearing. Had the court given the statutory notice as required, T.C. may have opted to voluntarily participate in treatment, eliminating the need for a hearing and avoiding entry of the involuntary commitment order that triggers the loss of firearm rights. In light of the analysis in A.M., we properly exercise our discretionary authority under RAP 2.5(a)(3) to review the asserted error.

B. Notice requirements in 14-day civil commitment proceedings under RCW 71.05.240(2).

The state statute squarely places the obligation on the trial court to notify the patient about the potential impact of the proceedings on firearms rights. RCW 71.05.240(2) explicitly states:

> (2) If the petition is for mental health treatment, the court at the time of the probable cause hearing and before an order of commitment is entered shall inform the person both orally and in writing that the

failure to make a good faith effort to seek voluntary treatment as provided in RCW 71.05.230 will result in the loss of his or her firearm rights if the person is subsequently detained for involuntary treatment under this section.

(emphasis added). There is no ambiguity in the statute. The statute does not provide for alternate methods of notice to the patient.

There are only two references in the record as to the potential loss of firearm rights. The first is in the form petition for commitment initiated by Song on behalf of the hospital which includes a section that states, "Petitioner further states that respondent has been advised that involuntary commitment pursuant to this 14-day petition will result in the loss of firearm rights." This petition is dated February 27, 2018, prior to entry of the commitment order. While the petition is in writing and dated prior to the probable cause hearing, it is not from the court, but rather from a medical professional who is adversarial to T.C. in the proceeding. Further, it does not explicitly advise the subject of the petition that the loss can be avoided by voluntary participation in treatment. Standing alone, this petition does not satisfy the requirements of RCW 71.05.240(2).

The next reference to firearms rights in the record is the court's order of commitment entered on February 28, 2018 after the conclusion of the hearing. In that order, the judge checked a box indicating, "Respondent was advised on the record" under the subsection "Firearms Possession Prohibition." This appears to have two issues; first, the verbatim report of proceedings submitted to this court does not support the finding that T.C. was advised by the court on the record of his loss of rights, and second, RCW 71.05.240(2) requires that this notice must be given prior to the actual loss of the rights. Here, the order was entered after

- 11 -

commitment had already been determined by the judge and merely advised T.C. that the loss of rights has occurred. This does not comply with the explicit requirements of the statute.

The commitment order also includes a checked box titled "Other"; which states, "Defense counsel has agreed on the record that he will advise his client of full hearing or jury trial and that firearms possession is prohibited. Defense counsel waives signature." This similarly does not comply with the statutory requirement that notice come from the court, both orally and in writing, before a finding of commitment. To further complicate matters, the only portion of the transcript that could possibly refer to this agreement by defense counsel is reflected with the notation "inaudible." Even if notice from defense counsel could satisfy the requirements of RCW 71.05.240(2), which it expressly cannot, there is nothing in the verbatim report of proceedings to confirm the content of that exchange.

C. When an issue of constitutional error is raised, the burden rests with the state to prove the error was harmless.

When reviewing an asserted constitutional error, the error is presumed to be prejudicial and the burden is on the state to prove it was harmless beyond a reasonable doubt. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). The state did not identify any evidence in the record to demonstrate that T.C. understood the impact of the involuntary commitment order on his constitutional right to possess firearms. The state's position at oral argument was that the petition can be used to infer understanding on the part of the person subject to detention. We decline to make such an inference based solely on the petition.

The state fails to meet its burden to demonstrate that the error was harmless beyond a reasonable doubt.

The circumstances of T.C.'s case are distinct from a recent unpublished decision by this court, In the Matter of the Detention of J.G., which also addressed a court's failure to comply with RCW 71.05.240(2). No. 78338-6-I, Slip op. (Wash. Ct. App. June 24, 2019), https://www.courts.wa.gov/opinions/pdf/783386.pdf. In J.G., assuming manifest constitutional error for the sake of analysis, the court found the error there was harmless for two distinct reasons. First, the record was clear that J.G. was aware of the possibility of his loss of firearm rights prior to the hearing. He made comments as he prepared for the hearing expressing concern over the potential loss of those rights. Id. at 9. Additionally, J.G. had demonstrated that he would not comply with treatment voluntarily, expressly admitting that he would stop medication upon leaving the hospital. Id. The court in J.G. relied on that evidence to find that there was no indication that a proper advisement from the court would have resulted in a different outcome.

The record here does not support the state's claim that T.C. was similarly aware of the potential loss of his firearm rights. We do not know how T.C. would have responded to the information that he could preserve his firearms rights by voluntarily participating in the recommended mental health treatment. We simply do not have sufficient facts before us to reach the conclusion that T.C. was informed in any meaningful way of his potential loss of rights, or how the loss could be avoided. In fact, the state expressly conceded at oral argument that the court erred in not giving the advisement as the legislature intended. The only possibly

relevant discussion of an advisement to T.C. occurred after the judge granted the civil commitment order and stated to defense counsel, "you will advise (inaudible)." Even if this was an oral advisement of loss of rights by the court, it still does not comply with the statute as it delegates the task to counsel and would have occurred after the order on commitment was already granted.

D. Remedy for the constitutional error resulting from the court's failure to give notice under RCW 71.05.240(2)

18 U.S.C.A. § 922(g)(4) preempts any state restrictions on firearm possession and clearly states that it is unlawful for a person to possess a firearm if they have "been adjudicated as a mental defective or . . . committed to a mental institution." RCW 9.41.047(1)(b) requires that the court forward the order of commitment to the "national instant criminal background check system index" within three judicial days of entry of a finding on involuntary commitment. As such, T.C.'s right to possess firearms under federal law was lost upon entry of the commitment order in the state court. If he had been given proper notice from the court, he may have opted for voluntary participation, avoiding an order of commitment. Without entry of this order of commitment into the national instant background check system, T.C. could have retained his firearm rights as to this 14-day petition. At oral argument T.C. asserted, and the State conceded, that no intermediate remedy exists to cure the infringement on the identified constitutional right which resulted from the court's failure to comply with the statute.

We find there was sufficient evidence to support the court's findings as to the likelihood of serious harm to others based on T.C.'s mental disorder and that

any error as to testimony from the judge was harmless, and that the breadth of case law clearly holds there is not a right to a jury in 14-day commitment hearings. However, the error as to advisement by the court was not harmless and we accept the parties' position that the only proper remedy is to restore T.C's right to possess firearms as if the commitment order never occurred. The court failed to meet its express notice obligations as required under RCW 71.05.240(2), resulting in prejudice as to T.C.'s constitutional right to possess firearms. We reverse and remand for an order vacating the 14-day commitment finding.

Reverse and remanded.

WE CONCUR: