# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>W.G.,<br><br>                Appellant. | No. 53660-9-II<br><br>UNPUBLISHED OPINION |

SUTTON, A.C.J. — WG appeals from an order extending his involuntary civil commitment by 180 days.  WG argues that the evidence was insufficient to establish that he continued to be gravely disabled.[1]  We disagree, and affirm.

## FACTS

### I.  ORIGINAL COMMITMENT AND EXTENSIONS

On October 25, 2016, the superior court dismissed a felony charge of failure to register as a sex offender[2] against WG without prejudice after finding that WG was unable to assist in his own defense and that he was unlikely to regain competence.  WG was transferred to Western State Hospital (WSH) to be evaluated for civil commitment.

---

[1] This appeal is not moot because an individual's prior involuntary commitment orders have potential collateral consequences. *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012).

[2] The sex offender registration requirement stemmed from convictions for sex offenses involving WG's daughters.

That same day, WG's treatment providers petitioned for a 180-day involuntary treatment order. On November 17, a commissioner found WG to be gravely disabled and ordered up to 90 days of additional involuntary treatment. Between February 2017 and November 2018, commissioners issued five more orders finding that WG continued to be gravely disabled and ordering up to 180 days of additional involuntary treatment.

## II. MAY 2019 PETITION

In May 2019, WG's treatment providers petitioned for yet another 180-day involuntary treatment order, alleging that WG continued to be gravely disabled. One of the petitioners, staff psychologist Dr. Debra Burnison, was the sole witness at the hearing on this petition.

Burnison testified that she had observed WG on the ward, spoken with his treatment team about his progress, reviewed his records, and performed a mental status examination. She diagnosed WG with schizoaffective disorder bipolar type and cognitive disorder not otherwise specified.

Burnison testified that over the past year, WG had become less aggressive and agitated and that he had increased his attendance in his treatment groups. She also testified that WG was able to care for his activities of daily living for the most part, but that he still needed prompting for "things like showering." Verbatim Report of Proceedings (May 20, 2019) (VRP) at 91.

Burnison attributed WG's improvements to a combination of his "medication adherence" and his presence in his current ward. VRP at 90-91. But she also commented that some of his

behavioral improvement "could also be an aspect of his cognitive difficulties" that resulted in "increased confusion."[3] VRP at 83, 90.

Despite acknowledging WG's improvements, Burnison testified that her biggest concern was that WG continued to deny his mental illness and his need to take medication. She noted that although WG currently took his medication voluntarily, he had no insight into his mental health, and he had admitted to her that he took his medication because he wanted to avoid being forcibly medicated by injection.

Burnison also testified that WG "continue[d] to display delusional thinking" and disorientation. VRP at 83. She testified that he thought that (1) it was 2012, (2) he was a "federal officer," (3) he had been at WSH for 10 years, (4) he had been discharged from WSH and was not supposed to be there, and (5) WSH was "some sort of disciplinarian's place" rather than a hospital. VRP at 84-85. WG also denied being required to register as a sex offender or any history of criminal charges involving his daughters, claiming that his sex offender status was instead based on "a mistake in his military record." VRP at 85. Additionally, WG continued to assert that he could be discharged to live near his daughters and had expressed "that he wants to live with his wife and his daughters," despite not being married, not having seen his daughters for 40 years, and his daughters not wanting him to know where they were. VRP at 84.

When the petitioners' counsel asked Burnison if, in her professional opinion, WG "would be able to consistently meet his basic health and safety needs" if released, Burnison responded that he would not. VRP at 86. She testified that this inability would be due to both his mental disorder

---

[3] Burnison testified that "increased confusion" can "paradoxically . . . result in somebody becoming more compliant and . . . adherent to the ward rules." VRP at 90-91.

and his cognitive deficits. Burnison also opined that his deficiencies would also put him at risk of serious physical harm if released.

As to WG's mental health history, Burnison testified that this was WG's sixth hospital admission since his first from 1998 to 2002. She stated that he had initially been released into a special program because of "the difficulty of finding a community placement." VRP at 87. WG was readmitted to WSH from the special program in 2003, but he left WSH against medical advice. He was then admitted again in 2005, 2008, and 2009. WG's 2009 admission continued until 2014.

Burnison noted that the lengthy admission from 2009 through 2014 was related to WG's refusal to register as a sex offender, and she commented that he was refusing to register now as well. Burnison testified that when she examined WG, he had stated "that he would consider registering a sex offender." VRP at 88. But when she followed up with WG's social worker, Burnison learned that "he does not consistently state that to his treatment team." VRP at 88. WG had also refused to consider a placement in an adult family home.

Burnison further testified that WG was not capable of making rational decisions regarding his psychiatric treatment and that he would not seek out or comply with mental health care if he was released. Based on her assessment of WG, she concluded that it was in his best interest to remain at WSH and that his needs would not be met in a less-restrictive alternative to total confinement. Burnison noted, however, that if WG were to "consistently agree[] to register as a sex offender and agree[] to an adult family home placement," he could be considered for "the discharge list." VRP at 88.

After hearing Burnison's testimony and the parties' arguments, the commissioner entered written findings of fact and conclusions of law and an order for up to 180 days of additional

involuntary treatment. The commissioner found that (1) WG continued to be gravely disabled, and (2) WG, "as a result of a mental disorder[,] is in danger of serious physical harm resulting from the failure to provide for his/her essential needs of health or safety." Clerk's Papers (CP) at 143.

WG appeals.

## ANALYSIS

WB argues that the commissioner's gravely disabled finding is not supported by substantial evidence.[4] We disagree.

### I. LEGAL PRINCIPLES

In a civil commitment proceeding seeking 180 days of additional treatment, the State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence.[5] *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Under this standard, the State must show that it is highly probable that the person is gravely disabled. *Labelle*, 107 Wn.2d at 209.

We "will not disturb the [commissioner's] findings of 'grave disability' if [the findings are] supported by substantial evidence which the [commissioner] could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209. "'Substantial evidence is evidence

---

[4] WG assigns error to the commissioner's finding of fact 2 and conclusion of law 2, which both state that WG continues to be gravely disabled.

[5] Citing *In re Det. of D.V.*, 200 Wn. App. 904, 906, 403 P.3d 941 (2017), WG asserts that the commissioner had to find that he was gravely disabled by a preponderance of the evidence. Br. of Appellant at 8. But the preponderance of the evidence burden of proof applies to 14-day involuntary treatment proceedings, not 180-day involuntary treatment proceedings. Former RCW 71.05.240(3)(a) (2018).

that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'"

*In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation marks omitted) (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998)).

## II. GRAVELY DISABLED

An individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder,[6] the individual is gravely disabled. *LaBelle*, 107 Wn.2d at 201-202. At the time of the hearing, former RCW 71.05.020(22) (2018) defined "gravely disabled" as

> a condition in which a person, as a result of a mental disorder . . . : (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

The commissioner relied on the definition in former RCW 71.05.020(22)(a). Accordingly, we address whether there was substantial evidence that would have allowed the commissioner to find that WG was "[i]n danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" by clear, cogent, and convincing evidence. Former RCW 71.05.020(22)(a).

When proceeding under the definition of "gravely disabled" in former RCW 71.05.020(22)(a), the petitioner

> must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, *shelter, and medical treatment* which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.

---

[6] WG does not dispute that any potential grave disability was the result of a mental disorder.

*LaBelle*, 107 Wn.2d at 204-205 (emphasis added). The danger of harm need not be evidenced by recent, overt acts. *LaBelle*, 107 Wn.2d at 204. Instead, the risk of harm "usually arises from passive behavior," such as when a person fails or is unable to provide for his or her essential needs. *LaBelle*, 107 Wn.2d at 204 (emphasis omitted).

"[U]ncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital." *LaBelle*, 107 Wn.2d at 210. The State must instead show that the individual's mental condition "render[s] him unable to make a rational choice with respect to his ability to care for his essential needs." *LaBelle*, 107 Wn.2d at 210. A key question is whether the person is able to "form realistic plans for taking care of himself outside the hospital setting." *LaBelle*, 107 Wn.2d at 210.

Here, the petitioners presented sufficient evidence to allow the commissioner to conclude by clear, cogent, and convincing evidence that if WG were to be released, he would fail to provide for the essential human needs of medical treatment and housing and that this puts him at risk of serious physical harm. Burnison testified that her professional opinion was that WG was not capable of making rational decisions regarding his mental health treatment and that he would not seek out or comply with mental health care if he was released. This opinion is supported by the evidence that WG did not believe he had a mental health disorder and that he took his medication only to avoid being forcibly medicated by injection.

Burnison also testified that WG continued to have unrealistic ideas about living with his non-existent wife and estranged children upon his release and that he refused to consider a more

realistic release plan of being released into an adult family home.[7] This demonstrates an in ability to make rational decisions regarding his shelter upon release, which places WG in danger of serious physical harm.

Not only does Burnison's testimony support the conclusion that WG would fail to provide for his essential human needs of health or safety, but WG's own history of repeated involuntary commitments must be considered when determining whether WG would receive "such care as is essential for his . . . health or safety" and the danger of serious physical harm. RCW 71.05.012 ("For persons with a prior history or pattern of repeated hospitalizations or law enforcement interventions due to decompensation, the consideration of prior history is particularly relevant in determining whether the person would receive, if released, such case as is essential for his or her health or safety."). WG's extensive history demonstrates a pattern of decompensation serious enough to result in additional, and often lengthy, hospitalizations. And WG's inability to care for his essential health or safety needs creates a danger of serious physical harm.

Although Burnison recognized that WG's condition had improved in many respects, the remaining deficits Burnison testified to and WG's history of involuntary commitments are sufficient to establish by clear, cogent, and convincing evidence, that WG "[i]s in danger of serious physical harm resulting from a failure to provide for his . . . essential human needs of health or

---

[7] WG notes that Burnison testified that she would consider releasing WG into a less restrictive alternative placement if he agreed to register as a sex offender, and argues that the record does not support a conclusion "that [WG] flatly refuses to register" because WG told her he would "consider" registering. Br. of Appellant at 10; VRP at 88. But WG's statement that he would "consider" registering was not agreement to register. Additionally, Burnison spoke to WG's social worker and determined that WG did not consistently state that he would be willing to register. Furthermore, even if WG had agreed to register, he still refused to agree to placement in an adult family home.

No. 53660-9-II

safety." RCW 71.05.020(22)(a). Thus, we hold that the commissioner's grave disability finding is supported by substantial evidence. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, A.C.J.

We concur:

WORSWICK, J.

MAXA, J.

9