# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of:<br>D.B., | No.  54470-9-II |
| STATE OF WASHINGTON, | |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| D.B., | |
| Appellant. | |

SUTTON, A.C.J. — DB appeals from a November 26, 2019 civil commitment order extending his involuntary commitment for up to 180-days.[1]  He argues that the evidence was insufficient to establish by clear, cogent, and convincing evidence that he was gravely disabled under RCW 71.05.020(23)(a).[2]  We disagree, and affirm.[3]

---

[1] We note that although this order has since expired, this case is not moot because it has potential collateral consequences.  *In re Det. of M.K.*, 168 Wn. App. 621, 629, 279 P.3d 897 (2012).

[2] The legislature has amended this statute several times since the petition in this matter was filed in November 2019, but the relevant language has not changed.  *See* LAWS OF 2020 ch. 302 § 3; ch. 256 § 301; ch. 5 § 1.  Accordingly, we cite to the current version of the statute.

[3] A heading in DB's opening brief states that he is arguing that the evidence supported placement in a less restrictive alternative (LRA), but he presents no argument related to whether an LRA was appropriate.  Accordingly, we restrict our analysis to whether the evidence was sufficient to support the grave disability finding.

FACTS

I. BACKGROUND

DB has been diagnosed as suffering from schizophrenia and has a history of civil commitments interspersed with years of living in the community. DB's first civil commitment was from July 1990 through May 1991. Following this commitment, "he was discharged to independent living" and continued to receive outpatient services until August 2009, when he stopped taking his psychiatric medications. Clerk's Papers (CP) at 294. DB was readmitted to Western State Hospital (WSH) in February 2010. Approximately a month later, DB was able to transition into independent living in an apartment in Tacoma and received "[p]eer and [c]ommunity [s]upport from Recovery Innovations." CP at 294.

In June 2013, DB again stopped taking his psychiatric medications. By early December, he had decompensated and was "found at a local grocery store displaying disruptive, agitated, and aggressive behavior." CP at 294. The police were contacted, and they took him to the hospital "where he continued to be agitated, reportedly swinging and spitting at staff and responding to internal stimuli." CP at 294. DB was transferred to another facility and then, in February 2014, to WSH. Prior to the current petition being filed, DB's commitment at WSH was extended 12 times.

## II. NOVEMBER 2019 PROCEEDINGS AND ORDER

On November 19, 2019, DB's providers petitioned for an additional 180-day commitment. The declaration in support of the petition and the testimony at the hearing provided the following facts.[4]

Throughout his time at WSH following his 2014 commitment, DB "displayed paranoid and grandiose delusions" that prevented him from progressing towards a discharge. CP at 295. DB denied having any mental health issues, demanded immediate release, and believed "that he is not part of the human race and that the 'divine mother earth' will take care of him." CP at 295. Due to his delusional beliefs and lack of cooperation, DB was unable to work with his social workers to develop a "realistic discharge plan." CP at 295-96, 298. And he continued to believe that he could just return to his former apartment in Tacoma. CP at 195, 298. When asked how he would meet his needs if released, DB could not "articulate a plan" and would state only that "the sacred mother earth would provide for his needs." Verbatim Report of Proceedings (VRP) at 71.

While at WSH, DB was compliant with his medications, but he stated that he would not continue to take his psychiatric medications if released. Over the course of this commitment, DB also came to believe that the food and tap water at WSH were poisonous, and he refused to eat food prepared at WSH or to shower for several days at a time. After a five-day "hunger strike" prior to the hearing, the staff convinced DB to eat by providing him with store-bought frozen meals. VRP at 81, 86. Despite his avoiding showers, he did manage to remain clean and odor

---

[4] In its findings, conclusions and order, the court stated that it had relied on the testimony and on the declaration in support of the petition. DB did not challenge the court's reliance on the declaration.

free. DB's concern about contamination also made any medical procedures difficult even where DB had witnessed the medical devices being cleaned.

Even with medication, DB continued to experience "unique auditory and visual experiences," but he asserted that they were not hallucinations. CP at 297. He also believed that he was not human "and that human beings do not have the power to 'imprison [him] anywhere on Earth." CP at 297 (alteration in original). Additionally, he believed that he has special powers, but he would not discuss what these powers were.

At the hearing on the petition, DB's psychologist, Dr. Graham Cooper, stated that he believed DB was gravely disabled as a result of a mental disorder. Dr. Cooper expressed concern that DB's belief that he is not human and that "no human authority has the right to hold him," might lead to him refusing to "comply[ ] with law enforcement if he needed to" and might mean that he would not "comply[ ] with conditions of release" if any were imposed. VRP at 85.

Dr. Cooper also opined that DB would not be able to care for his essential needs of health and safety if released. Dr. Cooper noted that there was no reason to believe that DB's "delusional beliefs regarding the food [at WSH] being poisoned" would not also arise elsewhere, for instance if he were placed in a group home. VRP at 70. As to DB's intent to stop taking his medications if released, Dr. Cooper stated that taking his medication is "a pretty basic need for him" and that if he stopped taking them "that would ultimately lead to the kind of behavior that had him hospitalized to begin with." VRP at 71. Dr. Cooper opined that DB would need "a fairly structured" environment, possibly an adult family home when he was ready for release. VRP at 74.

4

After reviewing the record and hearing Dr. Cooper's testimony, the trial court stated,

I've listened to the testimony and quite frankly, I see it a little bit differently as well. I think by clear, cogent and convincing evidence [DB] certainly does meet the conditions of the -- certainly prong one of the disability statute. And maybe the fact that he's been here six years is -- can indicate a couple of things. Number one, I think it's difficult at this point and I think it would be -- would make no sense to me at all to put him out on the street with the facts that he's isolative, the fact that it appears that this -- the medicine that he's taking isn't exactly helping him very much. He's not attending groups, he's not attending any issue to try to plan for self-care. He's disorganized. I'm satisfied clearly that he meets the conditions and I have signed the order. It is for a period of up to a hundred and eighty days.

VRP at 97. The court also found that DB was not ready for a less restrictive alternative.

In its written findings of fact and conclusions of law and order, the court stated,

[DB's] current mental status examination reveals: Delusional beliefs (being poisoned) food & Drink[.] [P]oor insight, isolative, not assaultive, not attending groups; unable to plan for self care[.]

Further based on the petition and [Dr. Cooper's testimony], [DB]: disorganized thoughts, continues to need the structure of the hospital.

CP at 307. The court found that DB was gravely disabled because "as a result of a mental disorder[, he] is in danger of serious physical harm resulting from failure to provide for his/her essential needs of health or safety." CP at 307.

## ANALYSIS

DB argues that the evidence was insufficient to establish that he was at substantial risk of serious physical harm from a failure to provide for his essential needs of health or safety. He argues that the petitioners demonstrated only that he refused to eat hospital food and did not want to continue his medication and that his prior success in the community as an outpatient shows that he can meet his essential needs. We disagree.

5

I. LEGAL PRINCIPLES

In a civil commitment proceeding seeking 180 days of involuntary treatment, the petitioners have the burden of proving that the respondent is gravely disabled by clear, cogent, and convincing evidence. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Under this standard, the State must show that it is highly probable that the respondent is gravely disabled. *Labelle*, 107 Wn.2d at 209.

We "will not disturb the trial court's findings of 'grave disability' if [the findings are] supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *LaBelle*, 107 Wn.2d at 209. "'Substantial evidence is evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019) (internal quotation marks omitted) (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998)).

II. GRAVELY DISABLED

An individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder,[5] the individual is gravely disabled. *LaBelle*, 107 Wn.2d at 201-202. Here, the court relied on the definition of gravely disabled in RCW 71.05.020(23)(a), which required the petitioners to prove that DB was "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." To establish grave disability

---

[5] DB does not dispute that any potential grave disability was the result of a mental disorder.

under subsection (a), the petitioners "must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05.

DB's beliefs that he was not suffering from a mental health condition, that he did not need medication, that he was not human, and that everything he needed would be provided to him by "sacred mother earth" demonstrated that DB was unable or unwilling to plan to meet any of his essential needs, let alone fulfill those needs. VRP at 71. And although his delusional belief that his food and water were being poisoned was specific to food and water at WSH, this delusion demonstrated how DB's mental health condition could interfere with his ability to meet his essential needs. The evidence that DB could not recognize that he needed to meet his basic needs and the evidence that his mental health condition could lead to delusions that could prevent him from meeting those needs established a high probability of serious physical harm to DB unless adequate treatment was afforded to him. Based on this evidence, we conclude that the gravely disabled finding was supported by substantial evidence of a clear and convincing nature. Accordingly, we affirm.

No. 54470-9-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

SUTTON, A.C.J.

We concur:

MAXA, J.

GLASGOW, J.