# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of<br><br>J.B.,<br><br>               Appellant. | No. 54832-1-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J. – JB appeals the order detaining him for 180 days for involuntary treatment, arguing that there was insufficient evidence to establish that he was gravely disabled under RCW 71.05.020(24)(b)[1] and a less restrictive alternative was not in JB's best interest.

We hold there was sufficient evidence to prove that JB was gravely disabled and that a less restrictive alternative was not in JB's best interest.

Accordingly, we affirm.

## FACTS

### I. PETITION

On behalf of Western State Hospital (WSH), Doctors Elwyn Hulse and Claude Parker petitioned for JB to receive involuntary treatment for an additional 180 days. JB had been at WSH for over 30 years; JB was first admitted to WSH in an effort to restore competency after he was

---

[1] The legislature has amended RCW 71.05.020 multiple times. *See* LAWS OF 2021, ch. 264 § 20; LAWS OF 2020, ch. 302 § 3; LAWS OF 2020, ch. 5 § 1. Because the amendments do not impact our analysis, we cite to the current version of the statute.

accused of killing his father. The doctors included with their petition a declaration detailing why they believed JB needed to continue to receive involuntary treatment.

## II. HEARING

The court held a hearing on the petition at which Dr. Hulse and JB testified. Dr. Hulse was a psychologist at WSH who had observed JB's behavior, reviewed JB's records, and discussed JB's case with JB's treatment team. Dr. Hulse testified that he had determined that JB had acute schizophrenia. JB had "a history of extreme and unending paranoid delusions." Sealed Verbatim Report of Proceedings at 7. The doctor explained that JB's delusions included believing a former psychiatrist had implanted transmitters in him to "homosexualize him," North Korea had given him nuclear weapons, and that he would be safe in the community upon being released if he could have sex with a prostitute. *Id.* Additionally, JB "as of late" talked more about how his father had asked JB to kill him so JB could escape the mafia. *Id.* The doctor also noted that JB had "[v]ery, very poor" insight into his mental illness, explaining that JB showed no comprehension that killing his father was likely a mistake or that he needed to move forward from that point in his life. *Id.* at 8. Additionally, JB refused to accept any feedback from his doctor and others when they told JB that his delusions were not real and that he needed to move on.

Dr. Hulse also testified that JB's judgment in making day-to-day decisions was very poor. JB continually acted on his delusions by writing the treatment team letters that were based on his delusions.

According to Dr. Hulse, JB's volitional control was "marginal, at best." *Id.* at 9. The doctor noted that JB had been immediately suicidal upon transferring to the doctor's ward a few months earlier. JB had repeatedly told his treatment team, " 'I'm suicidal.' " *Id.* at 10. Additionally, JB

had believed another individual had stolen JB's property; even after the property had been returned, JB kept wanting to fight the individual so JB was put on one-on-one monitoring to keep him from acting on his impulse to fight.

Dr. Hulse also testified that JB could not take care of his basic needs of health and safety if released. When the doctor tried to talk to JB about discharge plans and possibly going to a group home, JB rejected the idea. JB "just want[ed] to get his own apartment and do his own thing." *Id.* at 11. The doctor did not believe that JB would even know where to start to look for housing.

Dr. Hulse also noted that JB's day-to-day ability to function at the ward was impacted by his delusions because he spent most of his day focusing on his delusions, not thinking about how he could prepare for discharge. The doctor also noted that earlier in the year JB had been willing to work with staff on a discharge plan but that willingness had faded.

Dr. Hulse testified that JB could move to a less restrictive placement at some point. But before JB could move on to a less restrictive placement, he needed to go 90 days without one-on-one monitoring or being involved in an altercation. After those 90 days, then JB would be allowed "quad privileges." *Id.* at 12. Once JB adjusted to functioning independently in the quad, then he could move out of WSH and to a structured living community. Additionally, the only medication JB required was a shot every two weeks, and JB got the shot "[b]egrudgingly." *Id.* at 13. The doctor reported that JB had stated that he did not need the medication and that the medication made his mind weak. Dr. Hulse did not believe that JB would continue with his medication once released.

JB also testified. JB stated that he was ready to leave the hospital, and that he had prepared a statement for the court. The prepared statement largely consisted of JB recounting his life prior to being committed, a conversation between him and his father, and being under the mafia's

control. There is nothing in the record that indicates that JB spoke about why he should not receive an additional 180 days of involuntary treatment or a less restrictive placement.

### III. COURT'S RULING

The court found JB to be gravely disabled as a result of a behavioral health disorder that resulted in a severe deterioration in routine functioning evidenced "by repeated and escalating loss of cognitive or volitional control over actions" and that JB would not receive such care as is essential for health and safety. RCW 71.05.020(23)(b); Sealed Clerk's Papers (CP) at 30. The court found JB had a history of "fixed and extreme paranoid delusions." CP at 30. Additionally, the court found JB has "[v]ery, very poor insight into mental illness," no comprehension about his past or "what brought him to WSH." *Id.* According to the findings, JB also acted on his delusions, had "very poor judgment," had only "[m]arginal control," and had "emotional dysregulation." *Id.* The court also found JB did not have a realistic plan upon discharge and without structure JB could not care for himself.

The court determined that less restrictive treatment was not in JB's best interest. The court noted that JB still needed to complete three months without one-on-one monitoring, that JB also stated that he does not need medication because it makes his mind weak, and JB is only begrudgingly compliant with his medications.

JB appeals.

4

ANALYSIS

I. Sufficient Evidence for the Court's Findings

JB argues that the evidence is insufficient to support the trial court's conclusion that he is gravely disabled. We disagree.

A. Legal Principles

*1. Gravely Disabled*

An individual is gravely disabled if the individual "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(24)(b). If an individual has stabilized after receiving care, and their condition is no longer " 'escalating,' " the court would not be required to release the individual as long the individual "otherwise manifests severe deterioration in routine functioning and, if released, would not receive such as is essential for his or her health or safety." *In re Det. of LaBelle*, 107 Wn.2d 196, 207, 728 P.2d 138 (1986).

*2. Sufficient Evidence*

We review a trial court's decision on involuntary commitment to determine whether the trial court's findings of fact are supported by substantial evidence and if those findings of fact in turn support the court's conclusion of law and judgment. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person." *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015).

When seeking a 180-day commitment, the State must prove an individual is gravely disabled by clear, cogent, and convincing evidence. RCW 71.05.310. In other words, the State

must show the ultimate fact in issue is shown by evidence that is " 'highly probable.' " *LaBelle*, 107 Wn.2d at 209. Therefore, the court's "findings must be supported by substantial evidence in light of the 'highly probable' test." *Id.* An appellate court will not reverse the trial court's finding that the person is gravely disabled if that conclusion is "supported by substantial evidence which the lower court could reasonably have found to be clear, cogent[,] and convincing." *Id.* When considering if the evidence was sufficient, we view the evidence in the light most favorable to the petitioner. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

B. ANALYSIS

There was sufficient evidence that JB suffers from a severe deterioration in routine functioning evidenced by a loss of cognitive or volitional control. Despite being told by staff and his doctor that his delusions were not real, JB remained fixed on his delusions and refused to move forward with his life. Dr. Hulse also testified that JB's volitional control was marginal at best, noting that within the last six months one-on-one monitoring had been required on two occasions, once because JB had been suicidal upon transferring to the doctor's ward and a second time to prevent JB from acting on his impulse to fight another individual. Additionally, JB's testimony at the hearing also demonstrated how influential his mental illness is on his volitional and cognitive control. Instead of taking an opportunity to address the court about why he was prepared to be discharged, he read a statement that had nothing to do with whether he should continue to receive involuntary treatment or have a less restrictive placement. Finally, the doctor testified JB spent most of his day focusing on his delusions and writing letters, rather than preparing for potentially being discharged.

There was also sufficient evidence that, if released, JB would not receive the essential care for his health or safety. JB took his medicine begrudgingly, and the doctor did not believe that JB would continue to get his medication once released. JB had told his doctor that he did not think he needed the medication and that it made his mind weak. Additionally, if JB was released, his plan for being safe in the community was to have sex with a specific prostitute. Furthermore, as stated above, JB spent his days focusing on his delusions and writing letters on his delusions, rather than preparing for discharge, indicating if released he would focus on his delusions, not on obtaining essential care for his health or safety.

There was sufficient evidence to conclude that JB was gravely disabled under RCW 71.05.020(24)(b).

## II. LESS RESTRICTIVE ALTERNATIVE

JB argues that even if the court properly found JB to be gravely disabled, the State still failed to establish that a less restrictive alternative was not in JB's best interest because the doctor did not explain or support his opinion that JB was not able to manage a less restrictive alternative.

We conclude there was sufficient evidence supporting the court's finding that a less restrictive alternative was not in JB's best interest.

A. LEGAL PRINCIPLES

If the court finds that the individual is gravely disabled, then court must also find whether the best interests of the person, or others, will be served by a less restrictive treatment. RCW 71.05.320(1);[2] *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 182, 97 P.3d 767 (2004). The State has

---

[2] The legislature has amended RCW 71.05.320. *See* LAWS OF 2021, ch. 264 § 10; LAWS OF 2020, ch. 302 § 45. Because the amendments do not impact our analysis, we cite to the current version of the statute.

the burden of proving that less restrictive treatment is not in the individual's best interest of the individual. *T.A.H.-L.*, 123 Wn. App. at 186.

B. ANALYSIS

Here, the trial court's finding that a less restrictive alternative was not in JB's best interests was supported by the evidence. Dr. Hulse testified that JB needed to demonstrate that he could operate more independently and did not need one-on-one monitoring. Additionally, JB needed to avoid altercations for three months before Dr. Hulse would even recommend giving JB more independence within WSH. JB had required one-on-one monitoring on two occasions within the last six months due to suicidal statements and fighting impulses. Furthermore, JB claimed he did not need the medication; Dr. Hulse believed that JB would not continue to take the medication if released. JB also spent most the day focused on his delusions, indicating if he were to be discharged, he would focus on his delusions instead of caring for his needs in a less restrictive environment.

We reject JB's contention that the evidence did not support the trial court's finding regarding a less restrictive alternative.

CONCLUSION

The evidence was sufficient to support the trial court's conclusion that JB was gravely disabled and that a less restrictive alternative was not in JB's best interest. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 54832-1-II

_____
CRUSER, J.

We concur:

_____
MAXA, J.

_____
LEE, C.J.