IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>D.F. | No. 88099-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — D.F. challenges the trial court's order that committed him to 14 days of involuntary mental health treatment and avers that the State did not present sufficient evidence to support the court's finding that he was gravely disabled. We disagree and affirm.

## FACTS

On March 13, 2025, after having spent the previous night at a homeless shelter in Port Townsend where he was described as "disruptive, confused and agitated," D.F. "disrobed and ran outside the shelter." He was subsequently evaluated at Jefferson Healthcare Hospital. A designated crisis responder filed a petition for initial detention under the involuntary treatment act[1] (ITA) the same day. The petition stated that D.F. had been "seen multiple time at the hospital in his home county, Clallum [sic], for disorientation, agitation and confusions [sic]," had "recently been detained due to grave disability twice in the last week" before being discharged, and he had a historical "diagnosis of schizoaffective disorder."

---

[1] Ch. 71.05 RCW.

The initial petition alleged that D.F. was gravely disabled because he "cannot answer any orientation questions and rambles about his patents and other non-related responses."

As a result, D.F. was taken to Fairfax Hospital for further evaluation and treatment. Brian Hayden, a licensed mental health counselor and evaluator at Fairfax, filed a petition seeking 14 days of involuntary treatment for D.F pursuant to the ITA. Hayden's petition alleged that D.F. suffered from "a behavioral health disorder characterized by confusion, disorganization, behavioral agitation, nonsensical speech, disorientation and impaired insight and judgment," had been diagnosed with "Schizoaffective Disorder Bipolar Type" and had a history of prior hospitalizations for mental health issues, including at Fairfax in 2020. Hayden further asserted that while D.F. had been at Fairfax pursuant to the most recent incident, he had "continued to evidence symptoms of a behavioral health disorder by agitation, perseveration on medication, neglect of self-care, labile mood, pressured speech, and poor insight into symptoms or need for treatment." He also noted that D.F. was "showing an increased loss of cognitive and volitional functioning" and "unable to meet his own basic needs of health and safety," which Hayden opined necessitated further hospitalization.

The trial court held a probable cause hearing on the petition on April 3, 2025. Hayden was the State's sole witness, and he testified to D.F.'s conduct and symptoms while at Fairfax, in part reiterating allegations from the petition. Hayden also related that during his initial evaluation of D.F. he observed D.F. had "urinary incontinence that he did not appear to be aware of." Additionally, Hayden read

various excerpts of D.F.'s medical records from Fairfax during his testimony, including a notation that D.F. had "tightly tied his penis with a hair tie" in an attempt to address his incontinence and the hair tie was in place for two days before it was removed by hospital staff with scissors. The records indicated that involved hospital staff were concerned because D.F's. act could have caused "urine to reflux to the kidneys, causing kidney failure" and he did not cooperate with staff attempts to assess his genitals for trauma. Fairfax staff determined that D.F. was suffering from a urinary tract infection and he was put on antibiotics to address it. A basic metabolic panel was also ordered to be conducted every 48 hours to assess any possible damage to D.F.'s kidneys.

Hayden offered his opinion that D.F. was gravely disabled prior to and during the time of the hearing on the petition for involuntary treatment. He explained that this opinion was based on D.F.'s delusions which included his beliefs that he needed to drink his own urine to "to kill bugs on his teeth or to remove the poison from his body," was an alien, and "d[id] not actually have symptoms" or require his prescribed medications because he ultimately disagreed with his diagnosis. Hayden also noted that D.F. reported that he regularly ate "dinosaur meat" which had caused him to become pregnant. Critically, Hayden stated that D.F. had indicated "he would get rid of [his medications] as soon as he left the hospital."

At the conclusion of the hearing, the trial court found that the State had proved by a preponderance of the evidence that D.F. was "gravely disabled" under the ITA. It also found the evidence showed that "as a result of his disorder" D.F.

was unable "to provide for essential human needs and[,] in this case, . . . that essential need is medical treatment." The court was "persuaded by a preponderance of the evidence that harm w[ould] occur to [D.F.] unless adequate treatment [wa]s afforded to him" and, while it "considered less restrictive alternatives," was "persuaded that a less restrictive alternative [wa]s not in [D.F]'s best interest" at that time. The court further found that D.F. was "in danger of serious physical harm from a failure or inability to provide for his essential needs of health and safety" and ordered his commitment for treatment for a period not to exceed 14 days.

D.F. timely appealed.

## ANALYSIS

### I.      Sufficiency of the Evidence

D.F. contends that the trial court erred when it ordered his 14-day involuntary commitment because there was not sufficient evidence to support the finding that he is gravely disabled. He specifically avers that "the State failed to present recent, tangible evidence of D.F.'s failure or inability to provide for his medical treatment in the community" and Hayden's testimony actually indicated that "D.F. was able to communicate his medical needs" to hospital staff. The State responds that "there was ample evidence to support the trial court findings" because "Hayden testified that D.F.'s symptoms inhibited his ability to perform self-care."[2] We agree with the State.

---

[2] As a preliminary note, despite the fact that D.F. does not present any argument on the question of mootness, the State appropriately concedes this case is not moot. Because an involuntary commitment order may have adverse consequences even after the term of commitment

"An appellate court reviewing a trial court's decision on involuntary commitment considers whether the findings of fact are supported by substantial evidence and if those findings support the court's conclusions of law." *In re Det. of K.P.*, 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024). "'Substantial evidence' is the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.'" *Id.* (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). The party challenging the findings has the burden to demonstrate that they are not supported by substantial evidence. *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019).

In the context of a 14-day petition, the ITA instructs that "if the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, . . . is gravely disabled" and less restrictive alternatives are not feasible, the court must order that "such person be detained for involuntary treatment" in an appropriate facility. RCW 71.05.240(4)(a). "Gravely disabled," as relevant here, is defined as a condition where, "as a result of a behavioral health disorder," a person is "in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety." RCW 71.05.020(25)(a).

> In order to avoid the erroneous commitment of . . . persons under the gravely disabled standard, the State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.

---

has expired, this appeal is not moot even though D.F.'s 14-day commitment ordered here has long since been completed. *See In re Det. of M.K.*, 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012).

*In re Det. of LaBelle*, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986).

Here, the trial court's findings were supported by Hayden's testimony, which included the observations and diagnoses of other medical professionals who treated D.F. at Fairfax by his reading of their notes from D.F.'s medical records. Hayden testified that D.F. had "very poor insight and judgment regarding his own personal care" as evidenced by his delusions regarding his own body, his potentially harmful attempt to treat his incontinence, and his refusal of a trauma assessment after the hair tie had been removed from his penis. Hayden also stated that D.F. had asserted that, if released, would stop taking his medication and "the concern is that without medications, he will decompensate back to the state that he was in prior to admission." As to the ongoing treatment required to address the urinary tract infection and possible kidney damage, Hayden did not "have any faith that [D.F.] would be willing or able to engage in this care outside of the hospital." The court also took judicial notice of the fact that "if you cut off blood flow to any appendage of your body, including your penis, it can cause permanent damage." It further found that there was testimony that a forced stoppage of urination could cause "a potential back-up [of urine] to the kidneys that could cause kidney failure," which "can be fatal."

D.F.'s contention in briefing that the State cannot solely rely on evidence from the time D.F. was hospitalized at Fairfax is not supported by a citation to any binding authority. All that is required is "recent, tangible evidence" of grave disability. *LaBelle*, 107 Wn.2d at 204. If anything, the fact that D.F. acted this way *while* institutionalized with daily medical oversight, further supports the trial court's

finding that D.F. was gravely disabled at the time the commitment order was entered and could not provide for his own essential human need for medical treatment. Taken together, the evidence before the trial court was sufficient to support its findings of fact which, in turn, supported its ultimate conclusion that D.F. was gravely disabled and required involuntary treatment.

Affirmed.

WE CONCUR:

Birk, J.

Mann, J.