IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>W.V., | No. 85322-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — W.V. appeals his commitment to 14 days of involuntary mental health evaluation and treatment. He claims the evidence was too remote to support the court's findings and challenges the sufficiency of the evidence to support the court's conclusions that he was gravely disabled and that he posed a substantial risk of serious harm to others. Because ample, recent, evidence supports the trial court's decision, we affirm.

FACTS

For approximately two years, starting when W.V. was approximately 16 years old, W.V.'s family observed him experience episodes of violent behaviors accompanied by grandiose, delusional thinking. According to W.V.'s mother, she began to notice W.V.'s "odd" behaviors, including lying to "[see] if he could," around W.V.'s freshman year of high school. During these episodes, W.V.'s family described his behavior as disconnected from reality.

In August 2022, W.V. "came after" his mother, father, and 11-year-old brother with a kitchen knife in their home. W.V.'s family hid by barricading themselves in a room. W.V. tried to get into the room while "yelling [and] screaming" and attempting to stab through the door. According to his father, W.V. told the responding officers that he "was the Lord and a bunch of stuff -- religious stuff." W.V. was arrested and charged with felony domestic violence and hospitalized for nine days in the psychiatric unit of St. Joseph Hospital. W.V. was diagnosed with bipolar disorder while in the hospital. Since his diagnosis, W.V. has denied that he has a mental illness and has refused to voluntarily seek help.

Another incident occurred on March 24, 2023, when W.V. was 18 years old. W.V.'s escalating behavior prompted his mother, who was home with him, to run downstairs and lock herself in the bathroom within her bedroom, closing both doors. From the bathroom, she called W.V.'s father, who was at work, to ask him to send W.V.'s grandfather to the house for help. From outside the bedroom, W.V. screamed that his mother "should be decapitated," that he was "the Lord," and that "social media has been raping him."

When his grandfather arrived, W.V. claimed the home belonged to him and that he was going to sue his parents to take it over, and demanded his grandfather leave. The grandfather told W.V. that he might go back to jail if he did not calm down. W.V. responded that his grandfather would go to jail because he and W.V.'s grandmother "bought illegal drugs and physically abused us, or, me."[1] W.V. then picked up a spray bottle of cleaning product and threatened to

---

[1] W.V.'s grandfather denies ever purchasing drugs or abusing W.V.

2

spray it in his grandfather's eyes. W.V. tried to kick his grandfather, the grandfather tried to block W.V.'s foot, and W.V. punched him on the back of his head. W.V.'s mother had come out of the room and witnessed W.V. strike his grandfather. W.V. then sprayed her in the face with the cleaning solution and hit her in the arm. She called 911. To the responding police, W.V. expressed that he was "the Lord" and "the Christ."

W.V. was taken into custody and booked into Whatcom County Jail for assault in the fourth degree, with a domestic violence designation.[2] On April 3, 2023, a designated crisis responder (DCR) investigated W.V. and "decided not to detain [W.V.] for evaluation and treatment." On April 12, W.V.'s father filed a Petition for Initial Detention, requesting the court overrule the DCR's decision not to detain W.V. A Whatcom County Superior Court judge granted the petition on April 18, 2023, finding probable cause to detain W.V. for 72 hours of involuntary evaluation and treatment following his release from jail.

Pursuant to the order, W.V. was admitted to North Sound Telecare Evaluation & Treatment facility (North Sound) in Skagit County on April 20, 2023. On April 25, 2023, W.V.'s social worker and physician at North Sound filed a petition to commit him for 14 days of involuntary treatment. A hearing was held the next day. The trial court heard testimony from W.V.'s father, grandfather, mother, and a North Sound social worker. The court granted the petition, finding W.V. was gravely disabled and that he presented a substantial risk of serious harm to others.

---

[2] It was also ordered by a court that W.V. could not return to live with his parents and brother for an unknown amount of time after this incident.

W.V. appeals.

## DISCUSSION

A person can be involuntary committed to 14 days of inpatient treatment if the State proves by a preponderance of evidence that, as a result of a behavioral health disorder, the person is gravely disabled or presents a substantial risk of serious harm to themselves, others, or property. RCW 71.05.240 (4)(a); In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019).

We review a trial court's commitment order for whether the trial court's findings are supported by substantial evidence in the record, and whether the findings support the conclusions of law.[3] In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), review denied, 199 Wn.2d at 1009, 506 P.3d 645 (2022). Findings that are unchallenged by the appellant are treated as verities on appeal. State v. Stenson, 132 Wn.2d 668, 697, 940 P.2d 1239 (1997).

The trial court considered testimony regarding W.V.'s history of recent episodes and found him gravely disabled pursuant to RCW 71.05.020(25)(b) due to "a decrease in his routine functioning and ability to manage his behaviors" and evidence that W.V. would not "be taking care of his routine needs" if released from the evaluation and treatment facility. The court also found that W.V. had no income and no residence to which to return. Further, the trial court found W.V. presented a likelihood of serious harm to others due to the March 24 assault of

---

[3] While the 14-day order of commitment has since expired, W.V.'s appeal is not moot. "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." In re Det of M.K., 168 Wn. App. 621, 626, 630, 279 P.3d 897 (2012) (involuntary commitment order was not moot, as court could provide effective relief by vacating the order "to ensure that a trial court will not rely on it in subsequent involuntary commitment determinations").

his grandfather, the evidence provided by his father, grandfather, and mother regarding other incidents of violence that were "timely enough to be a danger to others," as well as violent behaviors that placed his family members in fear of harm.

W.V. does not assign error to the trial court's findings of fact, which are, therefore, verities on appeal. Rather, W.V. challenges the trial court's determinations both that he was gravely disabled and that there was a likelihood of serious harm to others. We address each in turn.

I.      Gravely disabled

The court found W.V. gravely disabled pursuant to RCW 71.05.020(25)(b), which defines "gravely disabled"' as

> a condition in which a person, as a result of a behavioral health disorder . . . (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

As an initial matter, W.V. argues that the evidence the court considered to make its findings was not "sufficiently recent to sustain the commitment order." W.V. argues that the evidence of his grave disability is too remote because his social worker did not testify to seeing any "overt symptoms" during his six days at North Sound. Further, W.V. argues the evidence was insufficient because of the lack of evidence of dangerous behavior or decompensation during the month preceding the hearing.

W.V.'s claim ignores that for the purpose of determining "whether a person is gravely disabled, [or] presents a likelihood of serious harm," "recent" means

5

"the period of time not exceeding three years prior to" the hearing on the petition for involuntary commitment. RCW 71.05.245(1), (3). Instead, W.V. compares his case to In re Det. of LaBelle, where the court reversed the trial court's conclusion that appellant Trueblood had a grave disability because the evidence provided by his doctor was too remote and insufficient, and the testimony of his social worker was insufficient. 107 Wn.2d 196, 217-18, 728 P.2d 138 (1986). The social worker's recent observations included that Trueblood complained of feeling threatened and persecuted, but that testimony proved only that Trueblood still suffered from a mental disorder, not that he was gravely disabled. LaBelle, 107 Wn.2d at 216-17. Trueblood's doctor testified that 2-3 months prior to the commitment hearing, Trueblood appeared to be "decompensating," but the doctor's testimony "suggest[ed] that Trueblood was cognitively oriented and intact" by the time of the hearing. LaBelle, 107 Wn.2d at 217.

The same cannot be said for W.V. at the time of his hearing. W.V.'s social worker testified that at the time of the hearing, W.V.'s "insight [spoke]" to denial of his mental illness. He told her that he was only at North Sound "because of his parents." She further testified that she believed W.V. was at a "very pivotal time" to address his illness, noting that if the present opportunity to treat him was missed, "the decline would continue to escalate and I would be concerned for his safety and others around him." The social worker testified that W.V.'s issues with school and social relations, sleep, memory loss possibly associated with mania, isolation, delusional and grandiose thinking, low frustration tolerance leading to volatile situations "with any stressors," lack of motivation, and mood

6

dysregulation contributed to her belief that W.V. would continue to decompensate if he did not continue prescribed treatment. Thus, unlike in LaBelle, testimony supported that W.V. continued to demonstrate severe deterioration in his routine function and inability to care for his own health and safety at the time of the hearing.

The court's findings, which are verities on appeal, support the trial court's conclusion that he was gravely disabled.

II.      Substantial risk of serious harm to others

The court also concluded that W.V. presented a substantial risk of serious harm to others under RCW 71.05.020(37)(a)(ii), which states that a substantial risk that "physical harm will be inflicted by a person upon another as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." The court supported this conclusion with W.V.'s historical diagnosis of bipolar disorder, for which he was prescribed Zyprexa, an antipsychotic; his family's testimony that "some things set him off in behavior that is a danger to others"; and evidence that W.V. assaulted his grandfather.

W.V. argues that the evidence was insufficient to establish that he posed a substantial risk of serious harm to others because he did not present a "current danger" at the time of his commitment. According to W.V., "[t]he evidence of dangerous behavior . . . was all more than a month old at the time of the hearing," as he had not displayed violent behaviors while in jail and at North Sound. W.V. specifically argues that the March 24 incident was too remote

because it occurred "slightly more than a month before the hearing on April 26," and that despite "the trying circumstances and constant surveillance of his incarceration and hospitalization, no evidence was presented of any similar incidents in the intervening time." Thus, he contends, evidence did not amount to "a 'recent overt act . . . which has caused harm or creates a reasonable apprehension of dangerousness.' " Again, we disagree.

As with the evidence of grave disability, the evidence the trial court considered in determining there was a substantial risk of serious harm was not too remote because it occurred within the three years prior to the hearing. See RCW 71.05.245(3). Moreover, " 'the practical effect of being placed in the hospital will usually eliminate the 'imminence' of one's dangerousness.' " LaBelle, 107 Wn.2d at 203 (quoting In re Det. of Harris, 98 Wn.2d 276, 284, 654 P.2d 109 (1982)) (determining that an individual who is hospitalized for treatment prior to their commitment hearing need to present an imminent, or present danger of serious physical harm resulting from a failure to provide for one's essential health and safety need to support a grave disability finding). Requiring "imminence" after or while a person is hospitalized for mental health treatment at the time of his commitment hearing, "would effectively invalidate commitment as soon as it occurs and would be inconsistent with the State's interest in confining those who pose a substantial risk of harm to themselves or others." LaBelle, 107 Wn.2d at 203; see Harris, 98 Wn.2d at 284.

Here, the trial court considered evidence of multiple incidents of W.V.'s behavior that caused physical harm to others, and placed others in reasonable

8

fear of such harm, all of which were sufficiently recent as they occurred in the three years prior to the hearing. The evidence included the incidents in March 2023, when he struck his grandfather and sprayed his mother in the face with cleaning solution, December 2022, when W.V. struck his father, and 2021, when he punched his mother in the face. This evidence was sufficient to support the conclusion that W.V. presented a substantial risk of serious harm to others.

Based on the record, the trial court did not err by determining that W.V. was gravely disabled and posed a substantial risk of harm to others. The court's conclusions satisfy RCW 71.05.240 and properly established grounds for a 14-day involuntary detention.

Affirmed.

_____
Chung, J.

WE CONCUR:

_____        _____
Feldman, J.                                            Brennan, J.