# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>B.C. | No. 85473-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — B.C. appeals a trial court's civil commitment order for 14 days of involuntary treatment, arguing the court's findings of fact and the State's evidence do not support a conclusion that she was "gravely disabled." We agree, reverse the commitment order, and remand with instructions to vacate the order. While substantial evidence supports the trial court's findings, the State offered no evidence to tie B.C.'s failure or inability to provide for her essential human needs with a high probability of serious physical harm in the near future.

I

On June 2, 2023, Cindie McKenna, a designated crisis responder, signed and dated a petition for initial detention of B.C. McKenna alleged B.C. presented an imminent likelihood of serious harm to herself and was in imminent danger due to being gravely disabled. In this petition, McKenna states she received a call requesting her to conduct an Involuntary Treatment Act, chapter 71.05 RCW, evaluation at WhidbeyHealth Hospital emergency department. According to a

hospital report, B.C. called 911 on the night of June 1, 2023, stating that if police officers did not arrive soon, she would shoot herself. B.C. did not have access to guns. While at the emergency department, B.C. is reported to have been agitated and screaming, demanded to leave, but was also confused, presented with flight of ideas, loose associations, and disorganized thoughts. Given B.C.'s presentation and declining voluntary inpatient admission, McKenna claimed there was no alternative safety plan available other than detention.

B.C. was admitted to Telecare North Sound Evaluation and Treatment Center on June 2, 2023. Joann Clemo, a clinical social worker at Telecare, signed, dated, and filed a petition for 14 day involuntary treatment on June 6, 2023. This petition contains several of the same allegations as McKenna's petition, adding information that B.C. was refusing medication. Both petitions were filed on June 6, 2023. A superior court commissioner held a hearing on the petition the following day.

Clemo testified she observed B.C. for two days before the hearing, which was five days after B.C. was admitted. After consulting medical records and provider notes, Clemo concluded B.C. has mental health disorders, including "historical diagnosis of major depressive disorder and anxiety disorder." Clemo identified the following symptoms that support a diagnosis of depressive disorder: lack of motivation for treatment, lack of engagement, "a lot of isolative behavior," labile mood, tearfulness, dysregulation, and "going from tearful to elevated to anger." Clemo saw some symptoms of manic behavior in B.C. and testified the provider planned to assess whether bipolar disorder could be ruled out. Symptoms

2

of manic behavior Clemo observed from B.C. included hyperverbal speech, hyperactivity, tangential thought content and speech, paranoia, multiple somatic complaints, and delusional thought content.

Clemo testified she believed B.C. was gravely disabled because her "meal intake has been poor and variable" and while B.C. had taken two doses of her medication, she had refused five times. Clemo noted that B.C. told her provider that she will not take anything other than Adderall, but Telecare does not prescribe Adderall and there was no plan to prescribe Adderall. Clemo testified she believed B.C. would fail to meet her needs and that this would result in serious physical harm based on B.C.'s medication noncompliance and inactivity in her treatment. "[N]othing has been treated that . . . she was brought here for." Clemo understood that B.C. had never been subject to involuntary commitment before and testified that she had not been able to determine B.C.'s baseline behavior. Clemo admitted she had limited availability to assess B.C., but noted B.C. was uncooperative in discharge planning with her provider and Clemo. Clemo testified B.C.'s provider experienced the same interactions during telepsych visits. Clemo attributed these behaviors to the disorders she had testified B.C. had. Clemo identified two instances where B.C. recently threatened suicide or harm to herself: the first was what led to B.C.'s initial detainment and the second was upon being admitted to Telecare while still on an ambulance gurney.

B.C. received several treatments and medications after being admitted in care. B.C. was scheduled to take one medication, Zyprexa, took it twice and refused five times. B.C. was regularly taking another medication, Ativan. Clemo

testified B.C. did not technically participate in one group because she instead left to play the piano. B.C. had refused a telepsych session once and whenever she had gone in, B.C. was only willing to talk about Adderall and left after becoming acutely agitated. When asked for her opinion on what would happen if B.C. remained with Telecare to continue treatment, Clemo noted after medication compliance, she would expect mood regulation, discharge planning, and treatment engagement to demonstrate B.C. will follow-up with her care after leaving the facility. If B.C. would not remain with Telecare, Clemo believed B.C. would be leaving untreated.

When Clemo described some symptoms as ones "we're seeing," B.C.'s counsel objected on grounds of hearsay and asked for a standing objection. The court granted a standing objection. On cross-examination, Clemo admitted she was not present when B.C. first arrived at the facility. B.C. was showering on her own, brushing her teeth, and had not made any suicide attempts or gestures since she has been there. At the time of trial, B.C. was not on one-to-one monitoring and her sleep was adequate.

The trial court entered the following findings of fact:

> Significant issues that point to mania. [B.C.] is refusing medication. She is acting tearful[,] hyperverbal, pacing, tangential thoughts. Not meeting w[ith] the provider. Not participating in groups.
>
> [B.C.] not addressing her mental health issues. [B.C.] has needed override medication.
>
> [B.C.] does not have discharge plan or a treatment provider to engage in treatment with if discharged.

4

Has not been willing to make plans regarding discharge.

The court found the State established by a preponderance of the evidence that B.C. is gravely disabled and ordered involuntary treatment for a period not to exceed 14 days. B.C. appealed. A week later, B.C. filed a motion for revision of the commissioner's ruling. Our record does not show that the superior court ruled on this motion.

II

B.C. first argues her appeal is not moot even though the commitment order has expired. The State does not concede this issue, but does not contest it either. We agree with B.C.

Generally, we will dismiss an appeal where only moot or abstract questions remain or where the issues the parties raised in the trial court no longer exist. In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012). An appeal is moot where it presents merely academic questions and where this court can no longer provide effective relief. Id. at 625-26. An individual's release from civil detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention. Id. at 626. For persons who are currently under a commitment order, a prior history of decompensation leading to hospitalizations "should be given great weight in determining whether a less restrictive alternative commitment should be ordered." RCW 71.05.012. RCW 71.05.285 states, "Such evidence may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety." Accordingly, a commitment order has a

collateral consequence in subsequent petitions and hearings, allowing us to render relief if we hold that the detention under a civil commitment order was not warranted. In re Det. of B.M., 7 Wn. App. 2d 70, 77, 432 P.3d 459 (2019); M.K., 168 Wn. App. at 629-30. This appeal is not moot and we address the merits of B.C.'s appeal.

III

B.C. argues the trial court erred in concluding she was "gravely disabled" because the State submitted insufficient evidence and the court's findings did not support its conclusion.

A person can be involuntarily committed to up to 14 days of inpatient treatment if it is proven by a preponderance of evidence that, as a result of a behavioral health disorder, the person is gravely disabled or presents a substantial risk of serious harm to themselves, others, or property. RCW 71.05.240(4)(a); In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "Gravely disabled" means, relevant here,[1] a condition in which a person, as a result of a behavioral health disorder is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety. RCW 71.05.020(25)(a). The petitioner must produce " 'recent, tangible evidence' " that the individual has failed or is unable to provide for essential needs such as " 'food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is

---

[1] The petitioner never asserted and the State does not rely on a contention that B.C. is "[g]ravely disabled" within the meaning of RCW 71.05.020(25)(b).

afforded.' " In re Det. of R.H., 178 Wn. App. 941, 946, 316 P.3d 535 (2014) (quoting In re Det. of LaBelle, 107 Wn.2d 196, 204-05, 728 P.2d 138 (1986)).  The petitioner must produce evidence that these deficiencies placed the individual in danger of serious physical harm.  In re Det. of A.M., 17 Wn. App. 2d 321, 333, 487 P.3d 531 (2021).  The failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors. LaBelle, 107 Wn.2d at 205.

The court must enter written findings of fact and conclusions of law after a probable cause hearing when deciding whether an individual should be involuntarily committed for 14 days.  In re Det. of A.F., 20 Wn. App. 2d 115, 123, 498 P.3d 1006 (2021).  We review a trial court's commitment order for whether the trial court's findings are supported by substantial evidence in the record, and whether the findings support the conclusions of law.  Id. at 125.  In LaBelle, the court looked to the entire record, including the trial court's oral decision, after concluding that the written findings of fact were inadequate.  107 Wn.2d at 219. Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise.  In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015).  When considering if there was sufficient evidence, we view the evidence in the light most favorable to the petitioner.  A.F., 20 Wn. App. 2d at 125.  Unchallenged findings of fact are accepted as true on appeal.  Tedford v. Guy, 13 Wn. App. 2d 1, 12, 462 P.3d 869 (2020).  We review conclusions of law de novo.  Id.

7

In A.M., the respondent was committed to Western State Hospital (WSH) and his treatment providers petitioned for an additional 180 days of involuntary treatment because the respondent was gravely disabled. 17 Wn. App. 2d at 324-25. A treatment provider diagnosed A.M. with " 'unspecified schizophrenia spectrum and other psychotic disorder.' " Id. at 326. A.M. believed he had an intestinal problem that was not supported by records and because of this belief, he refused to eat and had been eating only intermittently for a few weeks leading up to the commitment hearing. Id. at 333. A clinical psychologist testified that A.M. needed to be in a structured or secure environment that provided him with assistance in order to meet his basic health and safety needs. Id. at 326, 333-34. The A.M. court noted nothing in the record contradicted the evidence that the respondent would stop or severely limit his eating based on delusional beliefs regarding nonexistent health issues. Id. at 333-34. While the petitioners produced recent evidence of a failure or inability to provide for essential human needs, they did not establish that these needs placed A.M. in danger of serious physical harm. Id. at 334. "Because the record here is devoid of any evidence that AM's reluctance to eat was or could be harmful to AM," the trial court's finding that the respondent was gravely disabled under prong (a) of RCW 71.05.240(4) was not supported by the evidence. Id. at 335.

In A.F., the respondent was admitted to WSH because he was found to be a danger to others. 20 Wn. App. 2d at 118-19. When A.F. decided to leave against medical advice, the hospital petitioned for a 72-hour hold, which was granted, and then for 14 days of involuntary treatment on the grounds that A.F. was gravely

disabled. Id. at 119. A.F. suffered from Parkinson's disease. Id. at 126. A doctor testified that A.F.'s head and neck would move involuntarily when she spoke with A.F., and she believed that the movement was related to Parkinson's. Id. at 119, 126. A.F. exhibited tremors throughout his body. Id. at 126. Because of A.F.'s physical difficulties, he needed " 'pretty much around the clock care.' " Id. at 126-27. A.F. did not acknowledge that he needed care for his physical difficulties and could not articulate what medication he was taking. Id. at 127. The A.F. court held the trial court's conclusion that A.F. was gravely disabled under prong (a) was supported by substantial evidence. Id.

B.C. does not appear to challenge the trial court's written findings of fact, but instead argues that those findings of fact do not support the court's conclusion that she is gravely disabled. We agree.

Clemo did not relate discharge planning or mood regulation with high risks of serious physical harm should B.C. fail to improve in those areas before leaving treatment. Clemo identified B.C.'s suicidal ideation from the day of admission, B.C.'s comment that she "would try it again," and a lack of family and friends as continuing concerns that also figured "into her risk factor for leaving." But the trial court sustained B.C.'s standing objection to hearsay statements not admissible for the truth of the matter, and this covered B.C.'s suicidal thoughts or ideation that Clemo did not witness. The trial court noted a lack of evidence of B.C.'s alleged danger to self.

Clemo's testimony constitutes substantial evidence to support the trial court's finding that B.C. is refusing medication. Clemo believed that B.C. would

9

fail to meet her needs resulting in serious physical harm because of B.C.'s lack of medication compliance and inactivity in her treatment. But Clemo did not tie B.C.'s poor and variable food intake and refusal to take medication, or any other condition, with a "high" probability of serious physical harm "within the near future." LaBelle, 107 Wn.2d at 204-05. When asked for a prognosis if B.C. were released, Clemo simply stated, "I feel she would be leaving untreated." The doctor in A.F. testified that the respondent needed around the clock care due to his disabilities. Comparable testimony that would allow us to infer that there would be a high probability of serious physical harm within the near future is absent in our record. The trial court did not enter any findings of fact or comment on B.C.'s risk of suicidal behaviors other than pointing out there was no substantive evidence of such risk. The trial court's findings of fact do not support that B.C was in danger of serious physical harm resulting from a failure to provide for her essential human needs of health of safety. We hold that the trial court's conclusion that B.C. was gravely disabled under RCW 71.05.240(4)(a) is not supported by the findings of fact.

We reverse the order committing respondent for involuntary treatment and remand to the superior court with instructions to vacate the order.

Birk, J.

WE CONCUR:

Coburn, J.                    Hazelrigg, ACJ