**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Detention of: | No. 86015-1-I |
| A.P., | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |

FELDMAN, J. — A.P. appeals a 14-day commitment order under the Involuntary Treatment Act (ITA), ch. 71.05 RCW. A.P. asserts (a) the trial court erroneously concluded that she could be detained under the ITA for up to 14 days of involuntary mental health treatment and (b) RCW 71.05.240(6), which prohibits her from possessing firearms until a court restores that right under RCW 9.41.047, violates her equal protection rights by treating her differently than someone who agreed to voluntary mental health treatment. We disagree with both arguments and affirm.

I

On October 23, 2023, A.P. was initially detained for up to 120 hours of psychiatric evaluation and treatment at Valley Medical Center (Valley) after she flew from Chicago to Seattle and was found rolling around on the ground outside Boeing Field in Renton complaining that her ex-boyfriend and brother were trying to kill her. While A.P. denied any suicidal ideation, she acknowledged that she

had been thinking about jumping off the roof of her seven-story apartment building to escape from her brother who she believed was stalking and seeking to harm her. Later the same day, she was transferred to Fairfax Behavioral Hospital (Fairfax). Fairfax determined that A.P. required further evaluation and treatment beyond the initial 120-hour involuntary hold, and so it filed a petition for an additional 14 days of involuntary treatment based on grave disability under prongs (a) and (b) of RCW 71.05.020(25), which are quoted and discussed below.

Pursuant to RCW 71.05.240, a King County Superior Court commissioner held a probable cause hearing on October 30, 2023. Three witnesses testified at the hearing: (1) A.P.'s father, who testified regarding A.P.'s history of paranoid and suicidal behavior and that A.P. was "definitely manic" when he last spoke with her earlier that month; (2) Patrick Swann, a Mental Health Counselor at Fairfax, who testified that he had evaluated A.P., that A.P. has a working diagnosis of bipolar disorder with psychosis, and that A.P. presented a danger to herself and others in the absence of continued in-patient treatment; and (3) A.P., who denied having any suicidal thoughts in the past month and testified she would not harm herself and would provide for her essential human needs, including her medical needs, if permitted to return to her apartment. The court also heard closing argument from both parties.

Following closing arguments, the court granted Fairfax's petition. In its oral ruling, the court meticulously described the evidence supporting its ruling. And while the court expressly acknowledged A.P.'s testimony, it stated it was "not persuaded by [her] testimony." Instead, the court was largely persuaded by the

testimony of A.P.'s father, who it noted was "a credible witness." Lastly, the court also ruled, "as a result of being involuntarily hospitalized, [A.P.] does lose her constitutional right to possess a firearm. And that right can only be reinstated with a court order." The court subsequently entered a written ruling that both supplemented and incorporated its oral findings and conclusions. This timely appeal followed.

II

A.    Involuntary Mental Health Treatment

A.P. asserts that the trial court erroneously concluded that she could be detained under the ITA for up to 14 days of involuntary mental health treatment. We disagree.

RCW 71.05.240(4)(a) states in relevant part as follows:

[I]f the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, . . . is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed 14 days in a facility licensed or certified to provide treatment by the department or under RCW 71.05.745.

As this statutory provision requires, the trial court here found that A.P. was "gravely disabled" and could therefore be detained under the ITA for up to 14 days of involuntary treatment.

On review, we must determine "whether substantial evidence supports the [trial court's] findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728

P.2d 138 (1986). "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person" that the premise is true. *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). This is a deferential standard of review: "we consider the evidence in the light most favorable to the Petitioner[]," which in this case is Fairfax. *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021) (citing *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019)).

The trial court found that A.P. was "gravely disabled" under both prong (a) and prong (b) of RCW 71.05.020(25). Starting with prong (a), RCW 71.05.020(25)(a) defines "gravely disabled" as "a condition in which a person, as a result of a behavioral health disorder . . . [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." To establish grave disability under this statutory provision, the petitioner must prove both "recent, tangible evidence of failure or inability to provide for . . . essential human needs" and that "the failure to meet these needs placed [the person] 'in danger of serious physical harm.'" *A.M.*, 17 Wn. App. 2d at 334 (quoting *LaBelle*, 107 Wn.2d at 204-05; former RCW 71.05.020(22)(a) (2018)). Essential human needs, in turn, include "food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 204-05.

Substantial evidence supports the trial court's finding that A.P. was "gravely disabled" under RCW 71.05.020(25)(a). The trial court meticulously catalogued the behaviors that support this finding, which includes inconsistent sleep, pacing at night, failing to consistently take prescribed medication, removing her clothes in public, defecating in the shower, ripping up her mattress, wrapping a shower

curtain around her neck, rubbing a banana all over herself, and attempting to enter other patients' rooms. Based on this evidence, a fair-minded person could find, as the trial court did, that A.P. was gravely disabled under RCW 71.05.020(25)(a) because she was exhibiting active symptoms of a behavioral health disorder and was consequently unable to provide for her essential human needs.

Turning to prong (b), RCW 71.05.020(25)(b) defines "gravely disabled" as "a condition in which a person, as a result of a behavioral health disorder . . . manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." Here again, the trial court meticulously catalogued the relevant evidence regarding this determination, which includes A.P.'s repeated and escalating loss of cognitive and volitional control over her actions such that she would not receive essential medical care outside a hospital setting. As the trial court found, the record includes evidence that A.P. was hyperactive and paranoid, was making nonsensical statements, and believed her father was selling her to pedophiles, was trying to kill her, and was selling drugs as a member of a cartel. Based on this evidence, a fair-minded person could find, as the trial court did, that A.P. was gravely disabled under RCW 71.05.020(25)(b) because, in the absence of involuntary mental health treatment, she will continue to exhibit active symptoms of a behavioral health disorder.

Against this weight of evidence, A.P. claims that Fairfax failed to establish she was gravely disabled under prong (a) of RCW 71.05.020(25) because there is

no evidence of "a recent overt act of self-harm." While Washington law requires a "recent overt act," there is no requirement that it be an act of self-harm. Instead, we have recognized, "'This act may be one which has caused harm or creates a reasonable apprehension of dangerousness.'" *In re Det. of T.C.*, 11 Wn. App. 2d 51, 57, 450 P.3d 1230 (2019) (quoting *In re Det. of Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982)). The ITA defines "recent" as a "period of time not exceeding three years prior to the current hearing." RCW 71.05.245(3). The evidence satisfies this requirement in two respects. First, when A.P. completed the Columbia Suicide Risk Assessment while at Valley, she indicated she had suicidal ideation within the past month, including thoughts of "wanting to die" and "want[ing] it to be over." Second, also while at Valley, A.P. pulled down a shower curtain and wrapped it around her neck, which required immediate intervention by Valley medical staff. Viewed in the light most favorable to Fairfax, this evidence satisfies the recent overt act requirement.

A.P. next argues that Fairfax failed to establish she was gravely disabled under prong (b) of RCW 71.05.020(25) because she "recognized she had a bipolar diagnosis" when asked about this issue at the probable cause hearing and "indicated she will take her medication, continue regular outpatient care, and rely on her support system in times of crisis." But A.P.'s father testified that A.P. is fine until she starts smoking cannabis, which A.P. indicated she does "once in a while." The record also shows that A.P. failed to coordinate any outpatient services prior to moving to Seattle. And while A.P. claimed that her emergency plan was "I would call my aunt," her aunt lives in Illinois and there is no evidence that A.P. contacted

her aunt in mid-August 2023 when, according to her father, she was "definitely manic."

Lastly, A.P. cites *LaBelle* in support of her arguments, but that reliance is misplaced. In one of the consolidated cases in *LaBelle*, the Supreme Court held that the trial court erred in finding that Richardson (one of the appellants in *LaBelle*) was gravely disabled based on evidence of untreated impetigo, failure to seek dental care despite intermittent tooth pain, and inadequate nourishment prior to hospitalization. 107 Wn.2d at 213-14. But *LaBelle* involved a 90-day commitment hearing, which requires "clear, cogent and convincing evidence" of a "high probability of serious physical harm within the near future unless adequate treatment is afforded." *Id*. at 205, 209. Additionally, the record in *Labelle* did not show that Richardson was in any immediate risk of harm as a result of his medical and nutritional needs. Here, in contrast, the burden of proof regarding's Valley's 14-day commitment petition is "preponderance of the evidence," RCW 71.05.240(4)(a), and the risk of harm to A.P. and others was neither speculative nor insubstantial, particularly given A.P.'s statement that she was considering jumping off her seven-story apartment building and evidence that she had previously jumped off a 60-foot parking garage and nearly died from her injuries.

In short, the trial court did not err when it determined A.P. was gravely disabled under prongs (a) and (b) of RCW 71.05.020(25) and could therefore be detained for up to 14 days of involuntary treatment.

B.    Equal Protection Claim

Next, A.P. claims that RCW 71.05.240(6) violates her equal protection rights by treating her differently than someone who agreed to voluntary mental health treatment.  We disagree.

RCW 71.05.240(6) provides as follows:

> The court shall notify the person orally and in writing that if involuntary treatment is sought beyond the 14-day inpatient or 90-day less restrictive treatment period, the person has the right to a full hearing or jury trial under RCW 71.05.310. If the commitment is for mental health treatment, the court shall notify the person orally and in writing that the person is barred from the possession of firearms and that the prohibition remains in effect until a court restores his or her right to possess a firearm under RCW 9.41.047.

As A.P. notes, the effect of this statute is that a person who agrees to voluntary mental health treatment would not thereby be barred from the possession of firearms whereas someone who is involuntarily detained for such treatment is barred from the possession of firearms until a court restores that right under RCW 9.41.047.  This differing treatment, A.P. claims, violates equal protection principles.

"The Washington Constitution article I, section 12, and the Fourteenth Amendment to the United States Constitution ensure that persons similarly situated as to the legitimate purposes of a law receive equal treatment."  *State v. McClinton*, 10 Wn. App. 2d 236, 242, 448 P.3d 101 (2019).  We construe both our state and the federal equal protection clause identically.  *Id*.  Critical here, "To succeed with an equal protection challenge, [the proponent] must first establish that [they are] similarly situated with other persons in a class who have received different treatment under the same law."  *Id*. at 246.  Whether persons are similarly situated "is an inquiry that is determined by and relative to the purpose of the

challenged law." *State v. Pedro*, 148 Wn. App. 932, 946, 201 P.3d 398 (2009). If "the two classes are not similarly situated . . . no equal protection analysis is required and [the proponent's] equal protection claim fails." *State v. S.D.H.*, 17 Wn. App. 2d 123, 141, 484 P.3d 538 (2021).

A.P. claims she is similarly situated with other persons who have received disparate treatment under the challenged law. That is incorrect. The legislative purpose of the ITA is "[t]o protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state." RCW 71.05.010(1)(a). Unlike someone who has recognized the utility of continued mental health treatment and has therefore agreed to such treatment, A.P. was unwilling to receive such treatment absent a court order committing her for involuntary treatment. These two classes—persons who agree to voluntary mental health treatment and persons who, like A.P., are involuntarily detained for such treatment—do not share the same understanding of the necessity for further treatment and therefore do not present the same risk of harm to self and others. As such, they are not similarly situated relative to the purpose of the challenged law.

Additionally, it is axiomatic that "The State has an important interest in restricting potentially dangerous persons from using firearms." *State v. Jorgenson*, 179 Wn.2d 145, 162, 312 P.3d 960 (2013); *accord United States v. Rahimi*, 144 S. Ct. 1889, 1891 (2024) ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). Thus, in *Morris*

*v. Blaker*, 118 Wn.2d 133, 821 P.2d 482 (1992), our Supreme Court rejected a similar equal protection argument upon noting:

> The current statutory classification includes *only* those persons who have been judicially determined to be gravely disabled or to present a danger to themselves or others as a result of a mental disorder. The State has a compelling interest in keeping weapons out of the hands of persons who have been the subject of such a judicial determination.

*Id.* at 151. Because A.P. is not similarly situated with persons who have not been judicially determined to be gravely disabled under RCW 71.05.240(4)(a), no equal protection analysis is required and her equal protection claim fails.

A.P.'s contrary argument is unpersuasive. Quoting *State v. Sosa*, 198 Wn. App. 176, 184, 393 P.3d 796 (2017), A.P. claims that the two classes of persons at issue here—those who are detained for up to 14 days of involuntary mental health treatment and those who agree to voluntary treatment—are similarly situated because they share "materially similar circumstances." Those circumstances, A.P. avers, are continued mental health treatment, continued evaluation, and possible continued detainment at the expiration of the 14-day period under RCW 71.05.285. In so arguing, A.P. overlooks important differences between the two classes: one class has agreed to continued mental health treatment while the other has not, one class has been judicially determined to be gravely disabled under RCW 71.05.240(4)(a) while the other has not, and one class is subject to a 14-day commitment order while the other is not. In these respects, the two classes do not share materially similar circumstances, particularly with regard to the risk of harm to self and others. As *Sosa* confirms, "Without materially similar circumstances, there can be no complaint about

disparate treatment." 198 Wn. App. at 184. A.P.'s equal protection argument thus fails without further analysis.

Affirmed.

Feldman, J.

WE CONCUR:

Smith, C.J.

Mann, J.