IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>J.P. | No. 87816-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — J.P. challenges the order that committed her to 14 days of involuntary mental health treatment and contends that the State did not provide sufficient evidence to support the court's conclusions that she both presented a serious risk of harm to herself and was gravely disabled. We disagree and affirm.

FACTS

On December 18, 2024, J.P. got into a disagreement with her family, locked herself in a bathroom, and attempted suicide by tying an item[1] around her neck. She then "tied it to a fixture in the bathroom and sat down to hang herself." Her family became concerned, broke down the door, found her unconscious, and called 911. When law enforcement arrived, they cut the object from J.P.'s neck and provided medical care at the scene. J.P. was then admitted to Swedish Edmonds Hospital through the emergency room.

A designated crisis responder evaluated J.P. at Swedish Edmonds and filed a petition for initial detention for evaluation and treatment under the involuntary

---

[1] The record alternately refers to the item as a cord or belt. However, it is the act of the suicide attempt, not its precise instrumentality, that is relevant to our inquiry here.

treatment act[2] (ITA) on December 19. The petition stated that J.P. had been at "North Sound Treatment Center for substance use disorder treatment" for about a week but had "left prior to completing the program of her own volition" and a urinalysis conducted pursuant to her emergency care at Swedish Edmonds "was positive for methamphetamine and fentanyl." The petition further alleged that her behavioral disorder resulted in "an imminent risk to herself," "a loss of cognitive and volitional control," and she was "unable to care for her health and safety" because she showed a "profound lack of insight" into her suicide attempt and need for treatment, which justified commitment under the ITA.

That same day, J.P. was taken to Fairfax Hospital for continued treatment and evaluation pursuant to the custody authorization that followed the initial petition. On December 24, Brian Hayden, a licensed mental health counselor and evaluator at Fairfax, filed a petition for 14 days of involuntary treatment under the ITA. Hayden's petition averred that J.P. suffered from a "working diagnosis of Unspecified Mood Disorder" which was "characterized by irritability, labile mood, impaired impulse control, disorganized thought process, suicidal ideation with recent serious attempt, and poor insight and judgment." The 14-day petition asserted that J.P. both presented "a likelihood of serious harm to self" and was "gravely disabled" due to this behavioral health disorder which, separately or in combination, necessitated continued commitment for involuntary treatment.

A court commissioner held a probable cause hearing on the 14-day petition on December 26. The State presented testimony from the court evaluator from

---

[2] Ch. 71.05 RCW

Swedish Edmonds and Hayden. The court evaluator, "a licensed mental health counselor," testified to J.P.'s treatment and presentation while she was at Swedish Edmonds, which included reading from the notes of hospital staff, and largely reiterated the allegations from the December 19 initial petition.

Hayden testified to J.P.'s behavior while at Fairfax and also relied extensively on records created by other employees at the hospital, as J.P. had declined to speak with him directly. He adhered to his opinion contained in the 14-day petition; J.P. had a "working diagnosis" of "unspecified mood disorder" which resulted in a substantial risk of physical harm to herself and her grave disability. Hayden noted one of her symptoms included "minimizing the severity of the suicide attempt" and failing to engage with treatment and providers at Fairfax. The records Hayden relied on included an evaluation for J.P.'s suicide risk which was assessed as "high" on December 19, a "Mental Status Exam" which described her poor judgment and denial on December 21 of "any need for treatment or medications," another assessment also conducted on December 21 that stated she was "isolative" and was "[n]ot socializing with others and not attending groups," an assessment from December 22 that noted J.P. continued to minimize her symptoms "and the seriousness of the suicide attempt," and other records that continued to raise concerns about isolation and minimization on subsequent days leading up to the probable cause hearing.

J.P. called her occasional romantic partner, Rex Paul, to testify on her behalf. Paul stated that he had known J.P. for many years, roughly 19 to 20 as his former sister-in-law, and that she had appeared "really good" when they had

interacted the day before the hearing. He further stated his beliefs that it was safe for her to leave Fairfax and the suicide attempt was "out of character." Paul was present during J.P.'s suicide attempt and testified to the event. He also stated that J.P. had expressed interest in treatment in the past, had gone to substance abuse treatment willingly, but had left due to concerns over her storage unit and his upcoming "court issues."

J.P. also testified. She explained that she had not attended group therapy at Fairfax because she felt unsafe, skipped daily showers because her roommate had fouled the bathroom with excrement, and confirmed Paul's testimony about her treatment history. J.P. denied ongoing suicidal ideation but affirmed she had not been fully engaging in treatment while at Fairfax.

At the end of the hearing, the commissioner found that the State had established by a preponderance of the evidence that J.P. suffered from a behavioral health disorder, specifically a "working diagnosis of unspecified mood disorder." It also found that as a result of this disorder, J.P. presented "a likelihood of serious harm to herself" and she was "gravely disabled," either of which justified an order of commitment for involuntary treatment. The commissioner also stated that J.P.'s own testimony showed she was minimizing her circumstances and did not find Paul's testimony credible.

The commissioner entered written findings of fact, conclusions of law, and the order committing J.P. for involuntary treatment later that day and expressly incorporated their oral findings. As to the first statutory basis presented by the State, the commissioner found that J.P.'s condition was such that there was a

substantial risk of harm to herself based on her recent admitted suicide attempt, suicidality and depression in the six months leading up to the attempt, and statements at Swedish Edmonds that "she needed treatment and it was not safe for her to discharge." The commissioner further found that the State had also established that J.P. was gravely disabled because her disorder "had a substantial, adverse effect upon [her] cognitive and volitional functioning" and her lack of engagement in treatment showed she was not capable of "rational choices about her need for care." Finally, the commissioner found that a less restrictive alternative to commitment was "not appropriate" because J.P. continued to be "too symptomatic and ha[d] not engaged with treatment while in the hospital." Based on these findings, the commissioner concluded that J.P. had to be detained for involuntary treatment.

J.P. sought revision of the 14-day commitment order on January 3, 2025. The State filed a brief in opposition to J.P.'s motion for revision on January 7. A few days later, a superior court judge considered the motion for revision and denied it. In so doing, it affirmed and adopted the findings and conclusions of the commissioner as its own.

J.P. timely appealed.

ANALYSIS

As a preliminary matter, J.P.'s briefing on appeal contends that although the 14-day commitment order has expired, her appeal is not moot because "a trial court's commitment order under the [ITA] has enduring effects, and reversal will provide relief to J.P." The State did not address mootness in its response brief.

- 5 -

J.P. is correct that this appeal is not moot because the consequences of a commitment order remain long after the detained person is no longer subject to it. *See In re Det. of C.B.*, 9 Wn. App. 2d 179, 182-83, 443 P.3d 811 (2019); RCW 71.05.012, .212, .245. Accordingly, we reach the merits.

We separately note that the procedural posture here is impacted by the litigation decisions in the trial court. "All of the acts and proceedings of court commissioners [pursuant to chapter 2.24 RCW] shall be subject to revision by the superior court." RCW 2.24.050. Where, as here, an appeal arises after a superior court judge has denied a motion for revision, we consider only that order, not the underlying order of the commissioner. *In re Det. of B.R.*, 31 Wn. App. 2d 529, 538, 555 P.3d 435 (2024). This is so because denial of the motion to modify reflects an adoption of the commissioner's order by the superior court judge. *Id.* (quoting *Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017). Accordingly, "'we review the superior court's ruling, not the commissioner's decision.'" *Id.* at 538-39 (internal quotation marks omitted) (quoting *In re Det. of A.M.,* 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021)).

I.      Sufficiency of the Evidence

J.P. avers in her brief of appellant that the trial court erred because substantial evidence did not support the finding "that J.P. posed 'a likelihood of serious harm' to herself" because the suicide attempt was an impulsive one resulting from "methamphetamine intoxication." She also contends the State "failed to present evidence tying J.P.'s mental illness to her failure to, or inability to, provide for [her] essential needs" and the resulting legal conclusion was not

justified because other evidence contradicted those findings. The State's briefing on appeal contends that the finding of a likelihood of harm to self was supported by Hayden's testimony that J.P. remained at risk of self-harm even when she was no longer under the influence of methamphetamine and Hayden showed "that there was a nexus between [J.P.'s] mental health disorder and the substantial risk of harm." We agree with the State.

"An appellate court reviewing the trial court's decision on involuntary commitment considers whether the trial court's findings of fact are supported by substantial evidence and if the court's findings of fact support the court's conclusions of law and judgment." *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "'Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person.'" *Id.* (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). "The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact." *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "[W]e review the evidence in a light most favorable to the petitioner." *In re Det. of K.P.*, 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024). "We do not review a trial court's decision regarding witness credibility or the persuasiveness of the evidence." *A.F.*, 20 Wn. App. 2d at 125.

The trial court must find "by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled" before it can order they "be detained for involuntary treatment not to exceed 14 days." RCW

71.05.240(4)(a). The court must also consider, and decide against, "less restrictive alternatives." *Id.* Here, the petition for 14-day commitment was premised on two distinct statutory bases: a likelihood of serious harm to self and grave disability. A "[l]ikelihood of serious harm" is defined as a "substantial risk that . . . [p]hysical harm will be inflicted by a person upon [their] own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself." RCW 71.05.020(37)(a)(i). A person is "gravely disabled" for the purposes of the ITA if, "as a result of a behavioral health disorder," the person is "(a) in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety" or "(b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety." RCW 71.05.020(25). Here, the State pursued a theory based on subsection (a) regarding grave disability. The trial court concluded that commitment and involuntary treatment were justified under both of the statutory alternatives pleaded and argued by the State but we need only agree with one to affirm the commitment order. This is because the statutory bases for 14-day commitment are presented in the alternative, RCW 71.05.240, which means that an order for involuntary treatment may properly be entered on any of those grounds, individually or in combination, based on the particular facts of a case.

Here, the trial court's findings were supported by the testimony of the court evaluator from Swedish Edmonds and Hayden. Both relied on the observations of medical staff from Swedish Edmonds and Fairfax, and Hayden also testified to his

own observations. The evaluator from Swedish Edmonds stated that on admission, J.P. had reported to "feeling suicidal for the last six months," that she did "not feel safe at home," and she had "been having a lot of psychosocial stressors." Hayden testified that J.P. had a working diagnosis of "unspecified mood disorder" evinced by symptoms of "labile mood, angry affect, isolation to self" and J.P. had minimized "the severity of her suicide attempt," was "not engaging in active treatment," and was "minimally engag[ed] with the provider" at Fairfax. Hayden also read from the nursing assessment conducted on December 19. It expressly indicated J.P. had reported that she felt depressed and wanted to end her life. As part of that initial nursing assessment, J.P. was also given the Columbia-Suicide Severity Lifetime Risk Assessment.[3] Hayden explained the results of that assessment at length as follows:

> It does note her suicidal ideation both for lifetime and in the past month that, for the first question wish to be dead, she did respond "yes" to both.
>
> For nonspecific or active suicidal thoughts, she again responded "yes" to both.
>
> For active suicidal ideation with any method not planned without intent to act, for lifetime she did report "no." For the last month she did report "yes."
>
> For active suicidal ideation with some intent to act out specific plan, for the lifetime she reported "no." Within the last month reported "yes."
>
> For active suicidal ideation with specific plan and intent, over lifetime she reported "no." Within the last month she reported "yes."
>
> For the intensity of ideation, for lifetime on a scale of 1 to 5 she reports 2 with the notation, "I became homeless. Life was hard. For the past six months I feel [sic] suicidal. No plan." Recent most severe ideation 5. "Yesterday I did a suicide attempt via hanging."

---

[3] This is one of the suicide risk assessment tools developed by The Lighthouse Project at Columbia University and involves a series of questions intended to assess "whether someone is at risk for suicide, determine the severity and immediacy of that risk, and gauge the level of support that the person needs." *About the Protocol*, COLUMBIA UNIVERSITY, https://cssrs.columbia.edu/the-columbia-scale-c-ssrs/about-the-scale/ (last visited Feb.11, 2026).

For the frequency, how many times have you had these thoughts, over lifetime she reports 2 which is once a week. For the past month she reports 5 which is many times each day.

For the duration when you have these thoughts, how long do they last, over lifetime again she reports less than one hour some of the time and for the past month more than eight hours persistent or continuous.

Moving forward within the Columbia-Suicide Severity Rating Screen, fourth page for the risk formulation. First, the suicide risk is high. The rationale for considerations for risk determination, patient attempted suicide yesterday. Patient is denial [sic] today.

In briefing, J.P. avers that the State was required to disprove her theory that the suicide attempt was the result of "methamphetamine intoxication," not the result of her behavioral health disorder, and it needed "to prove an ongoing risk of harm once the intoxication had dissipated." She contends that because "within days of her admission to the hospital, [she] no longer endorsed suicidal ideation," the trial court's finding should have been that her suicidal ideation was "largely the product of methamphetamine use."

However, when we, as the reviewing court, conclude the trial court's finding of fact is supported by substantial evidence, we "will not substitute [our] judgment for that of the trial court even though [we] might have resolved a factual dispute differently." *Sunnyside Valley Irr. Dist. v. Dickey*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). "[E]vidence of a past suicide attempt is evidence of a substantial risk that physical harm will be inflicted." *H.N.*, 188 Wn. App. at 765. Our Supreme Court has held that the risk of physical harm can be "evidenced by a recent overt act." *In re Det. of Harris*, 98 Wn.2d 276, 284, 654 P.2d 109 (1982). J.P.'s suicide attempt on December 18 is plainly such a recent overt act that evinces a substantial risk of physical harm. Further, our Supreme Court has held that the

risk of harm remains even when lessened by hospitalization for treatment. *In re Det. of Labelle*, 107 Wn.2d 196, 203, 728 P.3d 138 (1984).

Next, regarding the nexus between the behavioral health disorder and an ongoing risk of harm, the trial court explicitly relied on Hayden's testimony to find that J.P.'s "mental disorder" included "minimization of her symptoms and suicide attempt." When asked about J.P.'s denial of suicidal ideation after she had been at Fairfax for a few days, Hayden explained that J.P. did not fully engage in subsequent suicide assessments, so "there would be no identified risk because she's not discussing what's going on" and, critically, her answers were not internally consistent, both factors suggestive of ongoing minimization, despite the seriousness of her attempt. As Hayden also noted, "Attempted hanging is a more lethal attempt because there really isn't—you can't kind of halfway strangle yourself." Further, even if methamphetamine intoxication did play a role in J.P.'s attempt, she continued to minimize her attempt after the effects of intoxication had dissipated, which Hayden attributed to her behavioral health disorder. Thus, there was sufficient evidence to demonstrate a connection between J.P.'s working diagnosis and the risk of harm to self.

When we consider the evidence regarding the circumstances and method of J.P.'s suicide attempt, her initial acknowledgment of suicidal ideation, coupled with her subsequent denials, sufficiently established that her symptoms placed her at an ongoing risk of harm to herself because she was unwilling or unable to acknowledge and address the issue with appropriate treatment. This evidence was sufficient to support the trial court's finding of fact and its ultimate conclusion

that J.P. was at a substantial risk of harm to herself and required continued commitment for involuntary treatment.

We may affirm on any basis supported by the record. *See In re Det. of Paschke*, 136 Wn. App. 517, 521, 150 P.3d 586 (2007). The statutory bases for involuntary treatment under the ITA are set out in the alternative, thus each may independently support a commitment order. Because we conclude that the trial court's findings regarding risk of harm to self were supported by sufficient evidence and its conclusions of law logically flowed from those findings, we need not analyze the sufficiency of the alternate basis found by the court, grave disability under RCW 71.05.020(25)(a).

Affirmed.

WE CONCUR:

Birk, J.          Feldman, J.