IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention<br><br>of<br><br>M.K. | No. 88197-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — M.K. has been diagnosed with bipolar disorder, post-traumatic stress disorder (PTSD), and depression. Since 2023, M.K. lived at Plymouth Crossing in Bellevue. In February 2025, Plymouth Crossing's site director observed a change in M.K.'s behavior and that he was more erratic. M.K. was admitted to Overlake Hospital and later transferred to Fairfax Behavioral Health Hospital. Fairfax recommended a 14-day involuntary treatment. The court held that M.K. had schizoaffective and bipolar disorders; that M.K. was gravely disabled under prong (b) of RCW 71.05. 020(25); and M.K. was a serious risk of harm to others. M.K. appeals. Because substantial evidence supports the court's finding that M.K. was gravely disabled and posed a likelihood of harm, and that a less restrictive option was not appropriate, we affirm.

FACTS

Background

M.K. has been diagnosed with bipolar disorder, PTSD, and depression. Since August 2023, M.K. has lived at Plymouth Crossing, a supportive housing facility for formerly homeless individuals. The site director, Amber Underwood,

observed that M.K. had interpersonal skills and was able to maintain a conversation.  But in February 2025, Underwood observed that M.K. had been struggling and his behavior was more erratic.  Also in February, M.K. reported to Underwood that somebody tried to break into his unit.  Underwood reviewed the camera footage and did not see anyone in M.K.'s hallway.  Underwood inspected M.K.'s unit and noticed that the "doorframe was jetted out into the hallway, like somebody had physically moved it from inside the unit."  Inside M.K.'s unit, Underwood observed several footprints on the door and on the doorframe.

In March 2025, M.K. told Underwood that he did not want to take his medication because it made him fat and he prefers being manic.  And in April 2025, Underwood reviewed camera footage and observed that M.K. punched a neighbor "in the face in an unprovoked attack."  Because of this incident, M.K. received a 30-day notice to change his behavior.[1]

### Overlake Hospital Stay

In April 2025, M.K. was admitted to Overlake Hospital's Emergency Room. Upon arrival at Overlake, M.K. yelled expletives at hospital staff and aggressively lunged towards them.  Although M.K. denied using drugs or alcohol recently, when M.K. was admitted, he tested positive for alcohol, amphetamines, and methamphetamines.  While at Overlake, M.K. threw a tray of food at the door, threw items in the bathroom, and was verbally aggressive toward hospital staff.[2]

---

[1] After the 30 days is over, if the similar behavior continues, Plymouth Crossing will issue a three-day notice for eviction.

[2] M.K. told hospital staff, "get me some food or I'll punch you in the fucking face" and "I will kill you fucking morons."

M.K. also took his medication inconsistently.[3] M.K.'s chart notes indicated that he presented as highly agitated with a loud volume and pressured speech and presented with severe alcohol use disorder and methamphetamine use disorder. Overlake concluded that M.K. required "a psychiatric hospitalization for safety, stabilization, diagnostic clarification, psychotropic initiation, and alignment without patient care."

When asked if he thought people were breaking into his apartment, M.K. said yes and that he would get violent with his neighbors if he saw them in his apartment. M.K. also claimed that someone hacked his bank account and he needed to make sure he got his money. M.K. stated to hospital staff that he needed to get out of the hospital because he needed to give his kidney to his friend.

Fairfax Hospital Stay

On April 11, 2025, M.K. was admitted to Fairfax Behavioral Hospital. Fairfax diagnosed M.K. with bipolar and schizoaffective disorders. Katherine Geisel, the hospital's court evaluator, observed that M.K. was very irritable, agitated, angry, and hyperverbal while at Fairfax.

M.K. stated to hospital staff that he did not have any mental issues, and he did not need to be on medication because he likes to be manic. M.K. also stated that people were messing with his e-mail and google accounts, his

---

[3] Sometimes, M.K. would take medication without complaint. Other times, M.K. stated that he refused to take his medication and, in one instance, M.K. threw his medication on the floor.

neighbors were stealing his stuff, his phone was hacked, and that his bank account got infiltrated.

Involuntary Commitment Hearing

During M.K.'s involuntary commitment hearing, Geisel testified that M.K.'s impairment had a substantial adverse effect on his cognitive and volitional functions. Geisel also concluded the M.K. was in danger of serious physical harm from a failure or inability to provide for his own substantial needs of health and safety. Geisel reasoned that M.K.'s irritability and difficulty in remaining in behavioral control, as evidenced by his outbursts and threats that he made, makes M.K. a danger to others. Geisel testified that M.K. was unable to provide for his own essential needs of health and safety because he did not sleep more than three hours a night and M.K. stated that he did not need sleep. Despite the lack of sleep, Geisel stated that M.K. presented with high energy. Geisel further testified that Underwood's testimony regarding M.K.'s 30-day notice also indicated to Geisel that M.K. was unable to provide for his basic needs of health and safety.

The court held that M.K. had schizoaffective and bipolar disorders; that M.K. was gravely disabled under prong (b); and M.K. was a serious risk of harm to others. The court noted that the most persuasive evidence came from Underwood, who detailed M.K.'s baseline, the recent symptoms of impaired impulse control, poor judgment, and poor insight into his condition, and evidence of recent harm. Evidence of serious risk of harm to others included kicking his

apartment door, punching another resident, and M.K.'s aggression toward hospital staff.  The court also found that M.K. self-reported that he stopped taking his medications, and that a connection existed between M.K. not taking his medication and his deterioration.  M.K. appeals.

ANALYSIS

Legal Principles

A petition for 14 days of involuntary treatment can be filed if the person's condition is "caused by a behavioral health disorder and results in . . . [a] likelihood of serious harm; or . . .  the person being gravely disabled."  RCW 71.05.230(1).  The State "must show, by preponderance of the evidence, that the person has not in good faith volunteered for appropriate treatment."  RCW 71.05.240.  The court may order that the person be detained "if the court finds by a preponderance of the evidence that a person detained for behavioral health treatment, as the result of a behavioral health disorder, presents a likelihood of serious harm, or is gravely disabled."  RCW 71.05.240(4)(a).  The court must also consider less restrictive alternatives and must find that "no such alternatives are in the best interests of such person or others."  RCW 71.05.240(4)(a).

When this court reviews involuntary commitments on appeal, it is limited to "determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusion of law and judgment."  *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019).  The court's findings "must be supported by substantial evidence."  *In re Det. of LaBelle*, 107 Wn.2d 196,

209, 728 P.2d 138 (1986). Substantial evidence is " 'evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.' " *T.C.*, 11 Wn. App. 2d at 56 (internal quotation marks omitted) (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 995 P.2d 836 (1998)). "The substantial evidence standard is deferential and requires the appellate court to view all evidence and inferences in the light most favorable to the prevailing party." *Lewis v. Dep't of Licensing*, 157 Wn.2d 446, 468, 139 P.3d 1078 (2006). The "burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact." *T.C.*, 11 Wn. App. at 56.

Gravely Disabled

*Gravely disabled* is statutorily defined as

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration from safe behavior evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25). The statute was "intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." *LaBelle*, 107 Wn.2d at 205-06. When determining whether a person is gravely disabled, "the court must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.245(1).

a. Care Essential to Health and Safety

M.K. contends that the court erroneously concluded that he was not receiving care essential to his health or safety. M.K. claims that other than his risk of losing his housing, the court did not find other reasons that M.K.'s deterioration prevented him from receiving care essential to his health and safety. The State asserts substantial evidence shows that M.K. would not have received care essential to his health and safety, and harmful consequences, such as a failure to take his medication, potential loss of housing and re-hospitalization, likely would have followed.

To show that commitment is justified, " 'such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.' " *In re Det. of M.K.*, 168 Wn. App. 621 (unpublished portion), ¶21, 629, 279 P.3d 897 (2012) (quoting *LaBelle*, 107 Wn.2d at 208). The State must show that the individual is unable to provide for their essential needs such as "food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05.

The State provided substantial evidence beyond M.K.'s potential loss of housing. Giesel testified that M.K.'s insight and judgment were poor, as evidenced by denial of his illness and his inability to understand the relationship between facts. Underwood and Giesel testified that M.K. told them he liked

7

being manic and did not want to take his medication. Although M.K. began to take his medication while at Fairfax, Giesel testified he needed additional hospitalization to stabilize, without further hospitalization, she concluded that M.K. may be prone to additional physical and verbal outburst.

Giesel further testified that in her expert opinion, M.K. was unable to provide for his own needs because he told Giesel that he did not require sleep and did not sleep more than three hours a night. Giesel noted that M.K. continued to present with high energy despite his lack of sleep. M.K.'s potential loss of housing, affirmative statements of his preference for being unmedicated, and his lack of sleep support that M.K. was unable to care for his essential needs.

Although M.K.'s actions did not reach crisis proportions, the statute's legislative intent addressed situations like M.K.'s. The statute permits intervention before a person reaches a crisis state and breaks the revolving door syndrome. RCW 71.05 "enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." *LaBelle*, 107 Wn.2d at 206. M.K. required hospitalization for stabilization, consistent with the statute's purpose.

b. Causal Nexus Between Deterioration and Not Receiving Care

M.K. asserts that the State did not prove a causal nexus between his mental illness and potential consequences. Specifically, M.K. claims that the State did not prove that M.K.'s assaultive behavior was the result of his mental

illness as opposed to his use of drugs and alcohol. The State contends that the evidence that M.K. had amphetamine, methamphetamine, and alcohol in his system only showed that he had those substances in his system when he was hospitalized at Overlake.

Under prong (b), the court must find that a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control[,]" and that they are "not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25)(b); *LaBelle*, 107 Wn.2d at 205. The statute requires that "the individual is *unable,* because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *LaBelle*, 107 Wn.2d at 208. A "causal nexus" must exist between " 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for his or her safety.' " *LaBelle*, 107 Wn.2d at 208 (quoting RCW 71.05.020(1)(b)). The rational decision requirement ensures that "a causal nexus exists between proof of 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for his or her health or safety.' " *LaBelle*, 107 Wn.2d at 208 (quoting RCW 71.05.020(1)(b)).

Underwood testified that when she started working at Plymouth Crossing about a year ago, M.K. was not aggressive, good at meeting his own needs, and was oriented in reality. Underwood testified that starting in February 2025, M.K. told her that he stopped taking his medication because he prefers being manic.

9

Underwood also observed that M.K. was more erratic and thought someone tried to break into his unit. Underwood also testified that M.K. told her that Bank of America staff tried to hack his phone. Further, Overlake noted that M.K. "present[ed] with severe alcohol use disorder and methamphetamine use disorder" and had a "[c]linical history and exam concerning for recurrent episode of psychosis and mania caused or exacerbated by alcohol and methamphetamine use." Although M.K.'s tests at Overlake showed that alcohol and drugs were in his system, evidence also showed that M.K. had not been taking his medication months before his admission to Overlake. It is likely that M.K.'s alcohol and drug use exacerbated the mental illness symptoms that he had already been experiencing. Substantial evidence indicates that M.K.'s behavior was a result of his mental illness.

<u>Likelihood of Serious Harm to Others</u>

a. Sufficient Evidence

M.K. contends that the evidence regarding M.K. punching his neighbor was insufficient to prove that he posed a likelihood of serious harm to himself or others. The State maintains that the evidence that M.K. punched a neighbor and his aggressive and threatening behavior at Overlake supported that M.K. posed a likelihood of serious harm to others.

Under RCW 71.05.020(37), a likelihood of serious harm is defined in part as a substantial risk that "physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places

another person or persons in reasonable fear of sustaining such harm" or that "the person has threatened the physical safety of another and has a history of one or more violent acts." A substantial risk to others can be established by three types of behavior: "threatening the physical safety of another and having a history of one or more violent acts", (2) causing such harm, or (3) by "placing a person in reasonable fear of sustaining such harm." *In re Det. of D.V.*, 200 Wn. App. 904, 907, 403 P.3d 941 (2017). Our Supreme Court has interpreted RCW 71.05.020 "as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness." *In re Det. of Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982). The statute includes physical harm to the property of others. RCW 71.05.020 (37)(a).

M.K. asserts that the punch was insufficient to show that he posed a likelihood of harm to others in part because no evidence was presented regarding whether the other resident was injured. However, beyond M.K.'s assaultive behavior toward his neighbor, M.K. displayed multiple overt acts of physical harm. Before M.K.'s hospitalization, M.K. kicked the doorframe of his apartment. At Overlake, M.K. was observed as poorly controlled and physically threatening. M.K. punched the wall with a closed fist, punched a garage door, and screamed at staff. M.K. also threw a tray of food and threw items within the bathroom. At Overlake, when asked if M.K. thought that people were breaking into his apartment, he said he would enact violence on his neighbors if he finds

11

them in there. Even if punching his neighbor was insufficient to show a likelihood of serious harm, M.K. had multiple instances of threatening physical harm toward people and property. We find no error.

b. Causal Nexus Between Assaultive Behavior and Mental Illness

M.K. also contends that his assaultive behavior and threats were due to his use of drugs and alcohol, not his mental illness. M.K. stresses that at Overlake, he exhibited assaultive and threatening behavior, but by the time M.K. was transferred to Fairfax, he was medication compliant and the staff had no safety concerns.

As discussed *supra*, M.K.'s alcohol and drug use exacerbated his mental illness symptoms. Ample evidence supports that M.K. stopped taking his medication and that he experienced paranoia several months before he was admitted to Overlake. Additionally, Underwood testified that when M.K. is better, he is not aggressive and not prone to outbursts. Substantial evidence supports that M.K.'s assaultive behavior was connected to his mental illness.

c. Less Restrictive Alternative

Finally, the court did not err when it found that a less restrictive alternative was not appropriate for M.K. Geisel testified that in her expert opinion, M.K. was not a good candidate for a less restrictive order. Geisel stated that if M.K. was released from the hospital, harmful consequences may include (1) potential assault toward other people in the community, (2) physical deterioration due to his inability to sleep, and (3) loss of control resulting in outbursts and failure to care for his basic needs. The court also held that although M.K. had made

improvements, his symptoms were still present. Given that M.K. was inconsistent in taking his medication, expressed multiple times that he likes being manic, and Giesel's testimony that M.K. still experienced paranoia and denied his illness, it was not error to find that a less restrictive alternative was not in M.K.'s best interest.

We affirm.

WE CONCUR: